UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DOMINICK RANIERI, d/b/a Dominick Ranieri
Architect, P.C.,

                    Plaintiff,

          v.                                              1:11-CV-1013
                                                         (GTS/CFH)
ADIRONDACK DEV. GROUP, LLC; HODOROWSKI
HOMES, LLC; J. LUK CONSTR. CO., LLC; COLDWELL
BANKER PRIME PROPS., INC.; FRANCIS J.
HODOROWSKI, SR.; FRANCIS J. "LUKE"
HODOROWSKI, JR.; KENNETH RAYMOND, JR.;
NORTHSTAR HOME DESIGNS, LLC; CREATIVE
CONCEPTS HOME PLAN SERVS., LLC; JOHN
KAZMIERCZAK; PAUL HODOROWSKI; STEPHEN
EDWARD LAMB; and CAPITAL DEV. GROUP, LLC,

                    Defendants.
_____

APPEARANCES:                          OF COUNSEL:

THORN GERSHON TYMANN &                ERIN P. MEAD, ESQ.
BONANNI, LLP                          MATTHEW H. McNAMARA, ESQ.
  Counsel for Plaintiff               PAUL D. JURELLER, ESQ.
5 Wembley Court, New Karner Road
P.O. Box 15054
Albany, New York 12212-5054

DREYER BOYAJIAN, LLP                  JOHN J. DOWD, ESQ.
  Counsel for Adirondack Defendants
  and J. Luk Construction Co., LLC
75 Columbia Street
Albany, New York 12210

BARCLAY DAMON, LLP                    MICHAEL A. OROPALLO, ESQ.
  Counsel for Coldwell Banker Defendants
  and Kenneth Raymond
One Park Place, 300 South State Street
Syracuse, New York 13202-2078

ROEMER WALLENS GOLD          MATTHEW J. KELLY, ESQ.
MINEAUX LLP
 Counsel for Northstar Defendants
 and Stephen E. Lamb
13 Columbia Circle
Albany, New York 12203

GLENN T. SUDDABY, Chief United States District Judge

## <u>DECISION and ORDER</u>

Currently before the Court, in this copyright infringement action filed by Plaintiff, Dominick Ranieri, d/b/a Dominick Ranieri Architect, P.C. ("Plaintiff") against the above captioned entities and individuals ("Defendants"), are the following four motions for summary judgment, pursuant to Fed. R. Civ. P. 56: (1) Plaintiff's motion for partial summary judgment against Defendants, Adirondack Development Group, LLC ("ADG"), Capital Development Group, LLC, Hodorowski Homes, LLC, Francis J. Hodorowski, Sr., Francis J. "Luke" Hodorowski, Jr. ("John Hodorowski"),[1] Paul Hodorowski (collectively "Adirondack"), John Kazmierczak, and Northstar Home Designs, LLC (Dkt. No. 93); (2) a motion for summary judgment filed by Defendants Northstar, John Kazmierczak, Creative Concepts Home Plan Services, LLC, (collectively "Northstar") and Stephen E. Lamb, seeking to dismiss the Amended Complaint as against them (Dkt. No. 97); (3) a motion for summary judgment filed by Defendants Coldwell Banker Prime Properties, Inc. ("C.B. Prime"), and Kenneth Raymond, Jr., seeking to dismiss the Amended Complaint as against them (Dkt. No. 98); and (4) a motion for summary judgment filed by the Adirondack Defendants and J. Luk Construction Co., LLC, seeking to dismiss the Amended Complaint as against them (Dkt. No. 101).

---

[1]      Plaintiff states that John Hodorowski was improperly sued as Francis J. "Luke" Hodorowski, Jr. (Dkt. No. 94, Attach. 20, at 1 [Pl.'s Mem. of Law]; Dkt. No. 101 [Adirondack's Notice of Motion].) Therefore, the Court finds that these two names refer to the same individual. The Clerk is directed to correct the docket to reflect that Francis J. "Luke" Hodorowski, Jr. is John Luke Hodorowski.

For the reasons set forth below, Plaintiff's motion is granted in part and denied in part and Defendants' respective motions are granted in part and denied in part.

# TABLE OF CONTENTS

Page

I.   RELEVANT BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

     A.   Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

     B.   Plaintiff's Motion for Partial Summary Judgment.. . . . . . . . . . . . . . . . . . . -6-

     C.   Northstar's Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . -7-

     D.   Defendant Raymond and C.B. Prime's Motion for Summary Judgment.. . . . . . . -7-

     E.   Adirondack's Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . -8-

II.  STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT. . . . . . . . . . -9-

III. ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

     A.   Whether Plaintiff's Copyrights Were Infringed.. . . . . . . . . . . . . . . . . . . . . . -11-

          1.   Whether Plaintiff's Work Is Protected by a Valid Copyright . . . . . . . . -11-

               a.   Whether Plaintiff's Failure to Advise the Copyright Office
                    that He Is Not the Original Author of the Designs Used to
                    Create Admiral's Walk Invalidates His Copyright. . . . . . . . . . -12-

               b.   Whether Plaintiff's Final Design for Admiral's Walk Is a
                    Derivative of The Martin Group's Cambridge Drawings and
                    Whether They Are Sufficiently Original to Be Entitled to
                    Copyright Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-

               c.   Whether Plaintiff's Copyright for Admiral's Walk Should Be
                    Invalidated Because the Registration Certificate Failed to List
                    the Correct Date of Creation or Designate the Author as a
                    Work Made for Hire.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

          2.   Whether Plaintiff's Designs Were Copied and Whether Such
               Copying Was Wrongful. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

               a.   Adirondack and Northstar. . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

               b.   Defendants Paul Hodorowski, J. Luk Construction Co.,

and Stephen Lamb. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

     c.     C.B. Prime and Defendant Raymond. . . . . . . . . . . . . . . . . . . -27-

B.     Whether Defendants Had Implied Non-Exclusive Licenses to Use
Plaintiff's Designs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

     1.     Vly Point. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-

     2.     Admiral's Walk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

     3.     Patroon Point & Jordan Point. . . . . . . . . . . . . . . . . . . . . . . . . . -40-

C.     Whether Plaintiff's Copyright Infringement Claims Are Time-Barred. . . . . . . -41-

     1.     Admiral's Walk & Vly Point. . . . . . . . . . . . . . . . . . . . . . . . . . . -42-

     2.     Jordan Point. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -47-

D.     Whether Defendants Can Be Held Liable for Contributory Copyright
Infringement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -49-

     1.     Adirondack Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -50-

     2.     Defendants Kazmierczak, Lamb, and Northstar. . . . . . . . . . . . . . -52-

     3.     C.B. Prime and Defendant Raymond. . . . . . . . . . . . . . . . . . . . . -53-

     4.     Vicarious Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -54-

E.     Whether the First Sale and Exhaustion Doctrines Preclude Plaintiff's
Infringement Claims Related to Vly Point and Admiral's Walk. . . . . . . . . . . -56-

F.     Whether C.B. Prime's Use of Plaintiff's Designs Was Permissible Under
the Fair Use Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -57-

     1.     Factor One: the Purpose and Character of the Use. . . . . . . . . . . . . -59-

          a.     Transformative Use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -59-

          b.     Commercial Use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -60-

          2.     Factor Two: the Nature of the Work. . . . . . . . . . . . . . . . . . . . . . -61-

3.      Factor Three: the Amount and Substantiality of the
Portion Used.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -62-

4.      Factor Four: the Effect of the Use Upon the Market for
or Value of the Original. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -62-

5.      Overall Assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -63-

G.     Whether Defendants Violated the Lanham Act . . . . . . . . . . . . . . . . . . . . . -64-

H.     Whether Plaintiff May Recover Statutory Damages and/or
Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -65-

I.     Whether Plaintiff's Claim for Unfair Competition Under N.Y. Gen.
Bus. Law § 349 Should Be Dismissed. . . . . . . . . . . . . . . . . . . . . . . . . . . . -67-

J.     Whether Plaintiff's Claim for Interference with Business Relations/Contract
and Interference with Economic Advantage Should Be Dismissed.. . . . . . . . -69-

K.     Whether Plaintiff's Conspiracy Claim Should Be Dismissed. . . . . . . . . . . . . -71-

L.     Whether Plaintiff's Breach-of-Contract Claims Should Be Dismissed as to
All Defendants Except Adirondack and Hodorowski Homes, LLC. . . . . . . . . -72-

# I.    RELEVANT BACKGROUND

## A.    Factual Background

Generally, the salient facts regarding the parties' respective motions are as follows. Plaintiff is an architect licensed in New York State.  (Dkt. No. 94, Attach. 21, ¶ 5 [Pl.'s Rule 7.1 Statement].)  Defendants John Hodorowski and Francis J. Hodorowski, Sr., owned ADG which was later renamed as Hodorowski Homes, LLC, at some point between 2011 and 2012 and taken over by Defendants John and Paul Hodorowski.  (*Id.*, ¶¶ 7-8, 10.)  Hodorowski Homes, LLC, is in the business of residential single and multi-family home construction.  (*Id.*, ¶ 9.)  Capital Development Group, LLC, is owned equally by Defendants Francis J. Hodorowski, Sr., and Kenneth Raymond, Jr.  (*Id.*, ¶ 11.)  Capital Development Group was an owner and the developer of three development projects referred to in this action as Vly Point, Admiral's Walk, and Jordan Point.  (*Id.*, ¶¶ 13-14, 18.)  J. Luk Construction Co., LLC, is a general construction company owned by John and Paul Hodorowski.  (Dkt. No. 93, ¶ 15 [Mead Aff.].)

Defendant, John Kazmierczak, is a draftsman (an unlicensed architect) and the owner of Northstar.  (Dkt. No. 94, Attach. 21, ¶ 15 [Pl.'s Rule 7.1 Statement]; Dkt. No. 93, ¶ 18 [Mead Aff.].)  Stephen E. Lamb is an independent contractor who typically stamped Defendant Kazmierczak's designs.  (Dkt. No. 93, ¶ 18 [Mead Aff.].)

<u>Vly Point</u>

At some point before December 2005, Plaintiff was approached by Defendants Francis and John Hodorowski about designing buildings and creating plans for a condominium development project referred to as Vly Point.  (*Id.*, ¶¶ 16-17.)  Plaintiff presented a proposal for Vly Point to ADG on September 29, 2004, and a contract was entered into between the parties on

December 9, 2004.  (*Id.*, ¶¶ 20-21.)  In accordance with the contract, Plaintiff developed plans for

Vly Point, which were to be used solely for that project.  (*Id.*, ¶¶ 24, 27, 29.)  ADG was the

builder of Vly Point; Capital Development Group was the owner and developer; Francis

Hodorowski, Sr., worked with Plaintiff in the conceptual design of the project; John Hodorowski

was the estimator and project manager; and Paul Hodorowski worked in the field doing punch-

list items and served as the sales liaison for the project.  (*Id.*, ¶ 18.)

Admiral's Walk

While the Vly Point project was underway, Plaintiff was approached to design

condominium units for Admiral's Walk.  (*Id.*, ¶ 58.)  At the time Plaintiff was consulted

regarding this project, site plan and zoning approvals had been issued based upon drawings

drafted by The Martin Group architectural firm.  (*Id.*, ¶ 62.)  Plaintiff had a previous relationship

with The Martin Group and reached an agreement with them to purchase the drawings.  (*Id.*, ¶

63.)  According to the agreement, Plaintiff owned the copyrights to the design, plans, and

drawings and could modify them if he chose to do so.  (*Id.*, ¶ 64.)  After the site plan had been

approved by municipal authorities, Plaintiff was hired by ADG to further develop the basic

concept design of these drawings.  (*Id.*, ¶ 65.)  The parties entered into an agreement on March

17, 2005.  (*Id.*, ¶ 66.)  As in the Vly Point project, ADG was the builder of Admiral's Walk,

Capital Development Group was part owner, and John Hodorowski was the estimator and project

manager.  (*Id.*, ¶ 60.)

Plaintiff provided ADG with a "Permit and Construction" set of drawings for this project.

(*Id.*, ¶ 69.)  Some of the changes made to The Martin Group's original drawings included the

removal of dormers, elimination of stone and using brick, changes to the arch detail, elimination

of windows, and a fourth floor "bonus" room.  (*Id.*, ¶ 70.)  Plaintiff's drawings became the

permit and construction set of drawings for Admiral's Walk and were stamped by Plaintiff and

accepted by ADG.  (*Id.*, ¶ 71.)

Patroon Point

ADG hired Plaintiff to provide designs, plans, and drawings for a townhouse project

referred to as Patroon Point.  (*Id.*, ¶ 93.)  Plaintiff provided ADG with a construction set of

drawings for Patroon Point to use for construction.  (*Id.*, ¶ 97.)  Adirondack had permission to

use Plaintiff's drawings and designs for this project only.  (Dkt. No. 101, Attach. 10, ¶ 51

[Adirondack Rule 7.1 Statement].)  Patroon Point was completed sometime in the year 2002.

(Dkt. No. 97, Attach. 1, ¶ 9 [Northstar's Rule 7.1 Statement].)

Plaintiff's Employment is Terminated

While construction was ongoing at both Vly Point and Admiral's Way in April of 2007,

ADG informed Plaintiff that it would no longer be using his designs, plans, or drawings, and

consequently, would not make any further payments under the parties' contract. (Dkt. No. 94,

Attach. 21, ¶¶ 35, 72 [Pl.'s Rule 7.1 Statement]; Dkt. No. 101, Attach. 10, ¶¶ 39-40

[Adirondack's Rule 7.1 Statement].)  ADG made this decision for what it believed were

"buildability" issues with Plaintiff's designs.  (Dkt. No. 101, Attach. 10, ¶¶ 35-38 [Adirondack's

Rule 7.1 Statement].)  In response, Plaintiff advised that, if ADG was no longer going to use his

services or designs, then ADG and Capital Development Group could no longer use his designs

to continue to get permits or for construction.  (Dkt. No. 94, Attach. 21, ¶ 36 [Pl.'s Rule 7.1

Statement].)

Thereafter, ADG hired Defendant Kazmierczak and his company, Northstar, to modify Plaintiff's drawings for both the Vly Point and Admiral's Walk projects. (*Id.*, ¶¶ 40, 76.) ADG gave Defendant Kazmierczak Plaintiff's drawings for these projects without informing Plaintiff or obtaining his permission. (*Id.*, ¶¶ 42, 46, 77. 86.) With respect to Vly Point, Defendant Kazmierczak made minor modifications to Plaintiff's design, including adding a master bedroom to certain units and a walkout basement. (*Id.*, ¶¶ 47, 53.) ADG has admitted that Plaintiff owns the Vly Point design, plans, and drawings and that the plans used to construct all the buildings on this project were the plans that contained Plaintiff's design aesthetic and his general overall design. (*Id.*, ¶¶ 48-49, 51.)

After his termination, Plaintiff learned that ADG and Capital Development Group were continuing to use his designs, plans, and drawings to obtain building permits for both Vly Point and Admiral's Walk. (*Id.*, ¶¶ 37, 73.) Plaintiff sent cease-and-desist letters to the Town of Niskayuna directing them to cease and desist from allowing Plaintiff's drawings to be used in connection with issuance of additional building permits on the projects. (Dkt. No. 101, Attach. 10, ¶ 49 [Adirondack's Rule 7.1 Statement].)

### Jordan Point

In July 2010, Plaintiff alleges that he discovered the site known as Jordan Point and recognized the buildings that were completed and those that were still under construction as being from his designs. (Dkt. No. 52, ¶ 84 [Pl.'s Am. Compl.]; Dkt. No. 109, Attach. 8, ¶ 4 [Ranieri Aff.].) It was later determined that ADG was the builder for the project, Capital Development Group was the owner and developer, John Hodorowski was the estimator and project manager, and Paul Hodorowski was an estimator and sales liaison. (Dkt. No. 94, Attach.

21, ¶ 91 [Pl.'s Rule 7.1 Statement].) ADG gave Plaintiff's Patroon Point drawings to Defendant

Kazmierczak and had him redraft them to be used for Jordan Point. (*Id.*, ¶ 104.) The

Adirondack Defendants and Defendant Kazmierczak have admitted that they used Plaintiff's

design, plans, and drawings to build the first four buildings at Jordan Point without Plaintiff's

knowledge or consent. (*Id.*, ¶¶ 108, 110.)

<u>C.B. Prime and Defendant Raymond</u>

C.B. Prime is a real estate company owned by Defendant Raymond.[2] (Dkt. No. 93, ¶ 17

[Mead Aff.].) C.B. Prime acted as the exclusive listing agent for the marketing and sales of the

condominiums and townhouses at Vly Point, Admiral's Walk, and Jordan Point. (Dkt. No. 98,

Attach. 2, ¶ 11 [C.B. Prime Rule 7.1 Statement].) As listing agent, C.B. Prime advertised real

estate for the three projects on certain websites that described the various building models, floor

plans, and included images of them. (*Id.*, ¶ 14.) The advertisements also included the following

disclaimer, "[a]rchitectural illustrations and floor plans are artist's concepts and may include

various features and options not part of the standard plan. . . . This sheet is for illustrative

purposes only and is not a working drawing." (*Id.*, ¶ 15.)

<u>Plaintiff's Certificates of Copyright Registration</u>

In May 2011 and May 2012, Plaintiff was issued copyrights from the U.S. Copyright

Office for architectural work and technical drawings related to the Vly Point project. (*Id.*, ¶ 55.)

In May 2011, June 2011, and June 2012, Plaintiff was issued copyrights for architectural works

and technical drawings related to the Patroon Point project. (*Id.*, ¶ 56.) In June 2011, Plaintiff

was issued a copyright for architectural work related to the Admiral's Walk project. (*Id.*, ¶ 57.)

_____

[2]      Defendant Raymond is also part owner of Capital Development Group, LLC.
(Dkt. No. 94, Attach. 21, ¶ 11 [Pl.'s Rule 7.1 Statement].)

<u>Plaintiff's Amended Complaint</u>

Based upon the foregoing, Plaintiff's Amended Complaint asserts the following eleven claims: (1) a claim for copyright infringement against all Defendants related to the Admiral's Walk, Vly Point, and Jordan Point projects; (2) a claim for contributory and vicarious copyright infringement against all Defendants; (3) a claim for unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against all Defendants; (4) a claim for breach of contract related to the Vly Point and Admiral's Walk projects against all Defendants; (5) a claim for unfair trade practices under N.Y. General Business Law § 349 against all Defendants; (6) a claim for unjust enrichment against all Defendants; (7) a claim for civil conspiracy against all Defendants; (8) a claim for tortious interference with business relations and contract against Defendants Kazmierczak, John Hodorowski, Paul Hodorowski, Stephen Lamb, and Kenneth Raymond; (9) a claim for tortious interference with prospective economic advantage against all Defendants; (10) a claim for account stated against all Defendants; and (11) a claim for quantum meruit against all Defendants. (Dkt. No. 52, ¶¶ 92-163 [Pl.'s Am. Compl.].)

## B. Plaintiff's Motion for Partial Summary Judgment

Plaintiff has moved for partial summary judgment with regard to liability on his copyright infringement claims (Counts One through Four) related to his designs for Admiral's Walk, Vly Point, and Jordan Point against the Adirondack and Northstar Defendants. (Dkt. No. 94, Attach. 20, at 1 [Pl.'s Mem. of Law]; Dkt. No. 52, ¶¶ 92-111 [Pl.'s Am. Compl.].) In support of his motion, Plaintiff argues that the Adirondack and Northstar Defendants are liable for direct, contributory, and vicarious copyright infringement because Plaintiff is the owner of valid and protected copyrights, which were unlawfully copied and used for these projects. (Dkt. No. 94, Attach. 20, at 3-14 [Pl.'s Mem. of Law].)

**C.     Northstar's Motion for Summary Judgment**

Defendants Northstar, John Kazmierczak, Creative Concepts, and Stephen Lamb have moved for summary judgment on Plaintiff's copyright claims (Counts One through Four) and Plaintiff's state law causes of action that allege tortious interference with business relations, contract, and prospective economic advantage (Counts Eleven and Twelve). (Dkt. No. 97, Attach. 15, at 1-6 [Northstar's Mem. of Law].) With respect to the copyright claims, these Defendants argue that they should be dismissed for the following four reasons: (1) Plaintiff's copyright claims are time-barred; (2) ADG was a valid licensee of Plaintiff's designs; (3) any changes made to Plaintiff's designs by Defendant Kazmierczak was de minimis and/or trivial in order to make them "buildable" and were done before Plaintiff had obtained copyright certificates; and (4) Defendant Kazmierczak acted at the direction of ADG, which had a license to use Plaintiff's designs. (*Id.* at 3-4.)

In regard to Plaintiff's tortious interference claims, Defendants argue that they should be dismissed because Plaintiff no longer had a business relationship with ADG and/or the Hodorowskis at the time ADG hired Defendant Kazmierczak and, thus, there was no relationship with which the Northstar Defendants could have interfered. (*Id.* at 5-6.)

**D.     Defendant Raymond and C.B. Prime's Motion for Summary Judgment**

Defendant Raymond and C.B. Prime have moved for summary judgment to dismiss Plaintiff's claims against them for the following six reasons: (1) Plaintiff's copyright infringement claims are precluded by an express and implied license to use the material in question; (2) Plaintiff has failed to allege a prima facie case of copyright infringement; (3) any purported infringement is not actionable under the First Sale, Exhaustion, and Merger doctrines,

and copyright protection does not extend to "scènes-à-faire"; (4) Defendants' use of any copyright architectural drawings was a "fair use"; (5) Plaintiff's claims are barred by the applicable statute of limitations; and (6) Plaintiff is not entitled to statutory damages or attorneys' fees because he did not register his copyrights until well after the alleged infringement(s) occurred. (Dkt. No. 98, Attach. 2, at 7-25 [C.B. Prime Mem. of Law].)

In addition, Defendant Raymond has moved for summary judgment on Plaintiff's copyright infringement claims on the basis that Plaintiff has alleged only conclusory claims against him devoid of factual support. (Dkt. No. 98, Attach. 3, at 6-9 [Raymond Mem. of Law].) Finally, Defendant Raymond has also moved for summary judgment on Plaintiff's state law claims against him, which allege tortious interference with business relations, contract, and prospective economic advantage (Counts Eleven and Twelve). (*Id.* at 3-6, 9.) Specifically, Defendant Raymond argues that these claims are time-barred and Plaintiff has failed to allege sufficient facts to make out a prima facie case. (*Id.*)

### E.    Adirondack's Motion for Summary Judgment

The Adirondack Defendants have moved for summary judgment to dismiss Plaintiff's claims against them. With respect to Plaintiff's copyright infringement claims, Adirondack has moved to dismiss them for the following seven reasons: (1) Plaintiff was not the author of the designs utilized by ADG on the Admiral's Walk project; (2) Plaintiff's designs for Admiral's Walk were not protected by a valid copyright and are not entitled to copyright protection because they are not original and/or are a derivative of The Martin Group's drawings; (3) ADG had a nonexclusive license to use Plaintiff's designs; (4) Plaintiff's claims are time-barred; (5) with respect to Jordan Point, Plaintiff should be barred from recovering damages for any infringing

acts that occurred prior to August 24, 2008, and Plaintiff's damages should be limited to nine-thousand and two-hundred dollars ($9,200.00); (6) Plaintiff has failed to specify or disclose facts demonstrating that the Adirondack Defendants induced, caused, or materially contributed to any infringing conduct that warrants contributory infringement liability; and (7) Defendants Francis J. Hodorowski, Sr., John Hodorowski, and Paul Hodorowski cannot be held vicariously liable for copyright infringement as a matter of law.  (Dkt. No. 101, Attach. 9, at 4-24 [Adirondack Mem. of Law].)  Furthermore, Adirondack has moved for summary judgment on the following claims: (1) Plaintiff's unfair competition claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and N.Y. Gen. Bus. Law § 349; (2) Plaintiff's state law claims for tortious interference with business relations, contract, and prospective economic advantage; and (3) Plaintiff's state law claims for conspiracy and breach of contract.  (*Id.* at 25-35.)

## II.    STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2).  As the Supreme Court has famously explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  As for the materiality requirement, a dispute

of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movign party. *Anderson*, 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c), (e). Where the non-movant fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

Finally, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that

argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.     ANALYSIS

### A.     Whether Plaintiff's Copyrights Were Infringed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth below.

"In order to make out a claim of copyright infringement for an architectural work . . . a plaintiff must establish three things: 1) that his work is protected by a valid copyright, 2) that the defendant copied his work, and 3) that the copying was wrongful." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100 (2d Cir. 2014). The Court will address each of these elements in turn.

#### 1.     Whether Plaintiff's Work Is Protected by a Valid Copyright

As indicated earlier, in support of his motion for partial summary judgment, Plaintiff essentially argues that he is the owner of valid and protected copyrights for Vly Point, Admiral's Walk, and Patroon Point, which were unlawfully copied by Defendants. (Dkt. No. 94, Attach. 20, at 3-9 [Pl.'s Mem. of Law].) Plaintiff argues that he is the owner of these three sets of architectural designs and drawings for the following three reasons: (1) he has valid copyrights for

each design; (2) the designs are his original works; and (3) Defendants do not dispute that he is the author of these designs or that he holds valid copyright certificates. (*Id.* at 3-5.)

In opposition, Defendants do not contest the validly or Plaintiff's ownership of the copyrights for Vly Point or Patroon Point. However, Adirondack argues that, because Plaintiff purchased the design plans for Admiral's Walk from The Martin Group and admitted using these designs with minor modifications, Plaintiff is not the author of the designs for this project. (Dkt. No. 110, at 2-3 [Adirondack's Opp'n Mem. of Law].) More specifically, Adirondack argues that Plaintiff's copyright for the Admiral's Walk designs should be invalidated for the following three reasons: (1) Plaintiff failed to advise the U.S. Copyright Office that The Martin Group was the original author of the designs; (2) the designs were a derivative of their prior work on other projects; and (3) the registration certificate incorrectly identified the "date of creation" as 2005 and failed to designate the author as a "work made for hire." (*Id.* at 4-7.)

### a. Whether Plaintiff's Failure to Advise the Copyright Office that He Is Not the Original Author of the Designs Used to Create Admiral's Walk Invalidates His Copyright

With respect to Adirondack's argument regarding original authorship, "[t]he Copyright Act of 1976 provides that copyright ownership 'vests initially in the author or authors of the work.' 17 U.S.C. § 201(a). As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989); *accord*, *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185 (2d Cir. 2004). "'[A]uthorship is a *sine qua non* for any claim of copyright . . . . That is, the person claiming copyright must either himself be the author, or he must have succeeded to the rights of the

author.'" *Sorenson v. Wolfson*, 96 F. Supp. 3d 347, 362 (S.D.N.Y. 2015) (quoting 1 Melville B.

Nimmer & David Nimmer, *Nimmer on Copyright* § 5.01[A] [1993]). "A certificate of copyright

registration is prima facie evidence of ownership of a valid copyright, but the alleged infringer

may rebut that presumption." *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182,

186 (2d Cir. 2012) (citing *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 [2d

Cir. 2004]).

      Here, as discussed above, Plaintiff purchased the design drawings for Admiral's Walk

from The Martin Group. Section 204 of the Copyright Act permits the transfer of copyright

ownership if the conveyance is in writing and signed by the owner of the rights conveyed or the

owner's agent. 17 U.S.C. § 204(a); *see also Tjehnavorian v. Mardirossian*, 56 F. Supp. 3d 561,

565 (S.D.N.Y. 2014). Plaintiff concedes that neither he nor The Martin Group retained a copy of

the written agreement; however, both parties agree that such an agreement was executed. (Dkt.

No. 109, Attach. 9, at 3 [Pl.'s Opp'n Mem. of Law].) Section 204 has been interpreted to allow

for the oral transfer of a copyright that will be given legal effect by a subsequent signed writing.

*Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 827-29 (3d Cir. 2011). In the present case,

Plaintiff has submitted a notarized letter from the Principal of The Martin Group, dated May 26,

2011, which states that

> [t]he Martin Architectural Group PC., had previously on or around
> April, 2005, conveyed to [Plaintiff] all common law, statutory and
> other reserved rights, including copyrights to the said designs and
> all provided drawings for the aforementioned Admirals Walk
> Condominium project, and that The Martin Architectural Group,
> PC., hereby attests and confirms that [it] retains no copyrights or
> any other rights to said plan documents and designs created solely
> for and with [Plaintiff] and developed at the Admirals Walk
> Condominiums Project in Cohoes, NY.

(Dkt. No. 101, Attach. 6, at 86 [Ex. "LL"].)

Accordingly, as the valid owner of the copyrights purchased from The Martin Group, Plaintiff obtained "a bundle of discrete rights," including the right to reproduce, prepare derivative works, distribute, or display work based upon the Admiral's Walk designs. *Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007) (citing 17 U.S.C. § 106). Therefore, the fact that Plaintiff was not the original author of the Admiral's Walk drawings does not invalidate his copyright claim because he properly purchased the copyrights from The Martin Group.

> **b.** **Whether Plaintiff's Final Design for Admiral's Walk Is a Derivative of The Martin Group's Cambridge Drawings and Whether They Are Sufficiently Original to Be Entitled to Copyright Protection**

Adirondack's second argument is that Plaintiff's designs for Admiral's Walk derived from previous work The Martin Group had done on an unrelated project known as "Cambridge."[3] (Dkt. No. 110, at 7 [Adirondack's Opp'n Mem. of Law].) Accordingly, Adirondack argues that Plaintiff's designs for the Admiral's Walk project are not entitled to copyright protection because they are a derivative of the Cambridge design, for which Plaintiff does not have copyrights.[4] (*Id.* at 7.) Furthermore, Adirondack appears to argue that Plaintiff's design for Admiral's Walk is

---

[3] More specifically, Plaintiff acknowledged that, at the time he was approached about the Admiral's Walk project, site plan and zoning approvals had been issued based upon "a building elevation and footprint" previously drafted by The Martin Group for a different project referred to as Cambridge. (Dkt. No. 109, Attach. 8, ¶ 33 [Ranieri Aff.].) Plaintiff further acknowledged that the Cambridge drawings that were submitted for these approvals became the precedence for the Admiral's Walk designs. (*Id.*, ¶ 34.)

[4] In addition, Adirondack cites language from The Martin Group's letter, which confirmed the sale of its copyrights to Plaintiff, where it is stated that The Martin Group "retains no copyrights or any other rights to said plan documents and designs *created solely for* and with [Plaintiff] and developed at the Admiral's Walk Condominiums Project." (Dkt. No. 117, at 3-4 [Adirondack's Reply Mem. of Law]) (emphasis added). According to Adirondack, this language should be interpreted to mean that Plaintiff is entitled only to copyright protection with respect to the elements of the Admiral's Walk design that differed from The Martin Group's Cambridge design. (*Id.* at 4.)

also not entitled to copyright protection as a derivative work.  (*Id.* at 8.)  Specifically, Adirondack argues that Plaintiff made minimal changes to the Cambridge design and the modifications were at the direction of Defendant Francis Hodorowski, not Plaintiff.  (*Id.* at 8.)  Therefore, Adirondack argues that any modifications to The Martin Group's prior work on the Cambridge design are not original to Plaintiff.  (*Id.*)

In reply, Plaintiff argues that his Admiral's Walk designs are not derivative works because the Cambridge design was never registered with the U.S. Copyright Office.  (Dkt. No. 109, Attach. 9, at 4-5 [Pl.'s Opp'n Mem. of Law]; Dkt. No. 114, Attach. 1, at 1-2 [Pl.'s Reply Mem. of Law].)  In addition, Plaintiff argues that his work for Admiral's Walk is entitled to full copyright protection because the designs ultimately used for the project were significantly different from The Martin Group's original Cambridge design.  (Dkt. No. 109, Attach. 9, at 5 [Pl.'s Opp'n Mem. of Law].)

As stated in the preceding section, a certificate of registration constitutes prima facie evidence of the validity of a copyright and the facts stated in the certificate.  17 U.S.C. § 410(c). However, "the Copyright Office's practice of summarily issuing registrations . . . counsels against placing too much weight on registrations as proof of a valid copyright." *Univ. Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010).  Furthermore, "the failure to alert the Copyright Office to relationships between the work for which registration is sought and prior works of others endangers the presumption of validity." *Gibson Tex, Inc. v. Sears Roebuck & Co.*, 11 F. Supp. 2d 439, 442 (S.D.N.Y. 1998) (citing *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F. Supp. 980, 988 [S.D.N.Y. 1980]); *see also Santrayall v. Burrell*, 993 F. Supp. 173, 176 (S.D.N.Y. 1998) (noting that, "[w]hen a claimant fails to advise the

Copyright Office of the reliance upon the work of another, the claimant does not afford the Office the fair opportunity to pass upon the question of originality in relation to the prior work").

In the present case, Plaintiff testified at his deposition that, when he was approached about site planning for the Admiral's Walk project, he contacted The Martin Group about obtaining potential building designs. (Dkt. No. 93, Attach. 9, 220:2-221:5 [Ranieri Dep.].) More specifically, Plaintiff sought to obtain designs used by The Martin Group on prior projects that he could use for Admiral's Walk in an effort to procure site plan approvals from the City of Cohoes without incurring the expense of creating new designs. (*Id.* at 220:7-22.) The Martin Group agreed to help Plaintiff and allowed him to go through a packet of their marketing drawings of their condominium projects. (*Id.* 220:22-221:4; 239:10-19.) Plaintiff acknowledged that the designs he selected from The Martin Group were designs that had already been used to construct buildings on one of its prior projects in New Jersey. (*Id.* at 221:10-17.) Significantly, Plaintiff testified that the designs he obtained from The Martin Group had copyright notices on them. (Dkt. No. 93, Attach. 9, 222:14-16 [Ranieri Dep.].) Plaintiff further testified that the building he designed for Admiral's Walk was a derivative of The Martin Group's design and that The Martin Group owned the copyrights to that building while he owned the copyrights to the new building. (Dkt. No. 93, Attach. 10, at 321:20-322:2 [Ranieri Dep.].)

Notwithstanding the above testimony, Plaintiff's Certificate of Registration for the Admiral's Walk design does not mention The Martin Group's prior design.[5] (Dkt. No. 101, Attach. 6, at 85 [Ex. "KK" to Adirondack's Mem. of Law].) Section 409 of the Copyright Act

---

[5]     Similarly, only "architectural work" was listed under the section entitled "Pre-existing Material." (Dkt. No. 109, Attach. 1, at 4 [Ex. "Z" to Pl.'s Opp'n Mem. of Law].)

requires an application for copyright registration to include "an identification of any preexisting work or works that [a derivative work] is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered." 17 U.S.C. § 409(9). Accordingly, the Court finds that evidence of Plaintiff's failure to register the design as a derivative work rebuts the presumption of the copyright's validity. "This finding does not, however, automatically invalidate the copyright. . . . Although the Court does not presume that [Plaintiff's] copyright is valid, [defendants] still must prove that [plaintiff's] design lacks the requisite originality for copyright protection in order to prevail on their motion for summary judgment." *Gibson Tex, Inc.*, 11 F. Supp. 2d at 442. "Conversely, [plaintiff] cannot succeed on its summary judgment motion without showing that its design possesses sufficient originality for copyright." *Id.*

With respect to originality, the Supreme Court has stated that

> the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be. . . . Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991); *see also Waldman Publ'g Corp. v. Landall, Inc.*, 43 F.3d 775, 782 (2d Cir. 1994) (holding that "[t]he law requires more than a modicum of originality. This has been interpreted to require a distinguishable variation that is more than merely trivial."). Therefore, in order to qualify for protection as a derivative work, and be separately copyrightable, the new contributions must, "when analyzed as a whole, . . . display sufficient originality so as to amount to an 'original work of authorship.'"

*Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 674, 680 (2d Cir. 1998); *see also Waldman*, 43 F.3d at 782 (stating that "[a] derivative work is copyrightable if it is sufficiently original").  "For better or worse, courts have not required an 'especially elevated' level of originality in the architectural realm." *Axelrod & Cherveny Architects, P.C. v. Winmar Homes*, 05-CV-0711, 2007 WL 708798, at *9 (E.D.N.Y. Mar. 6, 2007); *see also Yankee Candle Co. v. New England Candle Co.*, 14 F. Supp. 2d 154, 158 (D. Mass 1998) (noting that "[c]ourts have routinely protected modern architectural structures, such as commercial homes, that possess the minimal amount of originality that copyright law requires, as well as the plans from which owners built them").

Here, Plaintiff argues that his final design for Admiral's Walk was significantly different from The Martin Group's original Cambridge design because his design "removed dormers, eliminated stone and used brick, changed the arch detail, eliminated windows, and eliminated a fourth floor bonus room."  (Dkt. No. 109, Attach. 9, at 5 [Pl.'s Opp'n Mem. of Law].)  It is well established that standard features, "such as windows, doors, and other staple building components," are not copyrightable.  37 C.F.R. § 202.11(d)(2); *Zitz v. Pereira*, 119 F. Supp. 2d 133, 147 (E.D.N.Y. 1999).  However, "[a]s the Supreme Court's decision in [*Feist*] makes clear, a work may be copyrightable even though it is entirely a compilation of unprotectible elements." *Knitwaves, Inc. v. Lollytog Ltd. (Inc.)*, 71 F.3d 996, 1003-04 (2d Cir. 1995); *see also Zalewski*, 754 F.3d at 103-04 (noting that "doors and walls are not copyrightable, but their arrangement in a building is. Some architectural designs, like that of a single-room log cabin, will consist solely of standard features arranged in standard ways; others, like the Guggenheim, will include standard features, but also present something entirely new."); *Frank Betz Assoc., Inc. v. J.O. Clark*

*Constr., LLC*, 08-CV-0159, 2010 WL 4627293, at *5 (M.D. Tenn. Nov. 5, 2010) (noting that "[i]n the case of more mundane residential designs, it is obvious that the use of porches, porticos, dormers, and bay windows, for example, is not protected, but the particular expression of those ideas, and their combination in one house, may be protected").

Based on the current record, the Court is unable to determine, as a matter of law, whether the changes Plaintiff made to The Martin Group's Cambridge design render the final design sufficiently original and/or creative. "Typically, '[w]hen the originality of a copyrighted work is at issue, it becomes a question of fact for the jury to resolve.'" *Vargas v. Pfizer, Inc.*, 418 F. Supp. 2d 369, 372 (S.D.N.Y. Oct. 26, 2005) (quoting *Tin Pan Apple, Inc. v. Miller Brewing Co., Inc.*, 88-CV-4085, 1994 WL 62360, at *4 [S.D.N.Y. Feb. 24, 1994]). Accordingly, the Court finds that a genuine dispute of material fact exists regarding whether Plaintiff's modifications created a derivative design that warrants copyright protection.

        **c.**      **Whether Plaintiff's Copyright for Admiral's Walk Should Be Invalidated Because the Registration Certificate Failed to List the Correct Date of Creation or Designate the Author as a Work Made for Hire**

Adirondack's third argument is that Plaintiff is not the true author of the changes made to the Cambridge design because ADG dictated these changes to Plaintiff, who then incorporated them into the design. (Dkt. No. 110, at 8 [Adirondack's Opp'n Mem. of Law].) In other words, Adirondack argues that the design was a "work made for hire." (*Id.* at 6.) After carefully considering the matter, the Court is unpersuaded by this argument because "[a]n architect owns his drawings, unless expressly agreed otherwise by the parties[,]" and Adirondack has not provided or cited such an agreement. *Kunycia v. Melville Realty Co., Inc.*, 755 F. Supp. 566, 572 (S.D.N.Y. 1990). Furthermore, ADG did not provide an independently copyrightable

-19-

contribution to the design because it merely communicated the changes to Plaintiff. *See Sorenson*, 96 F. Supp. 3d at 362 (holding that "[defendant] did not translate any idea into a fixed, tangible expression entitled to copyright protection"). Although the changes were requested by ADG, Plaintiff, as an architect, used his training to incorporate the changes into the design while ensuring that they complied with New York State code. (Dkt. No. 93, Attach. 9, at 234:21-235:9 [Ranieri Dep.].) *See also Sorenson*, 96 F. Supp. 3d at 363 (holding that architect was author of plans for condominium unit where owner provided architect with instructions and sketches concerning the layout but architect used his training and skills to create the detailed floorplan).

Finally, the Court does not find that Plaintiff committed a fraud on the Copyright Office by failing to list the correct date of creation on the copyright registration form. (Dkt. No. 110, at 5-6 [Adirondack's Opp'n Mem. of Law].) "[O]nly the 'knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute[s] reason for holding the registration invalid.'" *Eckes v. Card Prices Update*, 736 F.2d 859, 861-62 (2d Cir. 1984) (quoting *Russ Berrie & Co.*, 482 F. Supp. at 988); *see also Lennon v. Seaman*, 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000) (stating that "[t]he party asserting fraud must establish . . . that the inaccuracies were willful or deliberate"). Plaintiff's deposition testimony and affidavit indicate that any perceived error was inadvertent and innocent. (Dkt. No. 93, Attach. 10, at 322:5-22; 324:21-325:2 [Ranieri Dep.] [explaining that Plaintiff answered all questions presented on the copyright registration form and believed his answers were correct]; 321:16-19 [describing belief that design was created in 2005 based upon a review of the drawings and/or a contract]; Dkt. No. 109, Attach. 8, ¶ 38 [Ranieri Aff.].)

For the foregoing reasons, Plaintiff's motion for partial summary judgment with respect to liability for copyright infringement of his Admiral's Walk design is denied, and Defendants' respective motions for summary judgment seeking to dismiss this claim are denied, pending the Court's consideration of the arguments below.

## 2. Whether Plaintiff's Designs Were Copied and Whether Such Copying Was Wrongful

After carefully considering the matter, the Court answers both of these questions in the affirmative, except with respect to Defendants Paul Hodorowski, J. Luk Construction, Lamb, and Raymond, for the reasons set forth below.

### a. Adirondack and Northstar

There is no dispute that Plaintiff's designs were copied. Instead, the parties dispute whether the use of these designs and/or copying was wrongful. "Once copying has been established, a plaintiff must next demonstrate that the copying was unlawful by showing that there is a substantial similarity between the protectible elements in the two works." *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 307 (S.D.N.Y. 1999). "The appropriate test for substantial similarity is 'whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 204 (S.D.N.Y. 2010) (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 [2d Cir. 2001]). "The copied elements of the work must be original and nontrivial to constitute improper appropriation." *Jean*, 2002 WL 287786, at *5. Therefore, where "a work is an amalgamation of protectible and unprotectible elements, a 'more discerning' ordinary observer test is employed . . . , which requires that the court first filter out from consideration any non-protectible elements. The remaining, protectible elements are

then analyzed for substantial similarity." *Sheldon*, 748 F. Supp. 2d at 204 (citing *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1002 [2d Cir. 1995]).  "Yet, infringement encompasses more than just literal copying. . . . 'Where the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged elements of his or her work,' this too constitutes unauthorized copying."  *Zalewski v. T.P. Builders, Inc.*, 875 F. Supp. 2d 135, 147 (N.D.N.Y. 2012) (Sharpe, J.) (quoting *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010]), *aff'd*, 754 F.3d 95 (2d Cir. 2014).

"[B]ecause the question of substantial similarity typically presents an extremely close question of fact . . . , questions of non-infringement have traditionally been reserved for the trier of fact." *Gaito Architecture*, 602 F.3d at 63 (internal citations omitted); *see also Hoehlingv. Univ. City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980) (noting that "summary judgment has traditionally been frowned upon in copyright litigation").  However, "it is entirely appropriate for a district court to resolve [the question of substantial similarity] as a matter of law, 'either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'" *Gaito Architecture*, 602 F.3d at 63 (quoting *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 [2d Cir. 1983]).

C.B. Prime argues that the merger doctrine[6] and the doctrine of "scènes-à-faire"[7] preclude

---

[6]    The merger doctrine "instructs that some ideas can only be expressed in a limited number of ways–single words or colors for example.  When expression is so limited, idea and expression 'merge.'  Expressions merged with ideas cannot be protected, lest one author own the idea itself." *Zalewski*, 754 F.3d at 102-03 (citing *Morrissey v. Proctor & Gamble Co.*, 379 F.2d 675, 678-79 [1st Cir. 1967]).

[7]    The "scènes-à-faire" doctrine "teaches that elements of a work that are 'indispensable, or at least standard, in the treatment of a given topic'–like cowboys, bank robbers, and shootouts in stories of the American West–get no protection." *Zalewski*, 754 F.3d at 102 (quoting *Hoehling*, 618 F.2d at 979).

a finding that Defendants' copying of Plaintiff's designs was unlawful. (Dkt. No. 98, Attach. 2, at 22-25 [C.B. Prime's Mem. of Law].) In support of this argument, C.B. Prime relies on the Second Circuit's recent decision in *Zalewski*, which affirmed Chief U.S. District Judge Gary L. Sharpe's dismissal of an architect's copyright claims. In *Zalewski*, plaintiff, an architect, was retained to create home designs, which were inspired by a colonial style of architecture. *Zalewski*, 875 F. Supp. 2d at 139-40. As in the present case, Zalewski's business relationship with the project owner that hired him was eventually terminated and Zalewski alleged that the project owner continued to advertise and build homes based on his drawings. *Zalewski*, 875 F. Supp. 2d at 139.

In dismissing Zalewski's copyright claims, both Judge Sharpe and the Second Circuit focused on the issue of substantial similarity and whether Zalewski's arrangement of unprotected elements in his designs had created an original, protectable whole. To this end, Judge Sharpe noted that the two designs had a "multitude of differences" as well as "some common features." *Id.* at 153. However, Judge Sharpe ultimately found that "the overwhelming majority of the similarities can be attributed to the fact that both [Zalewski's] and defendants' works are heavily influenced by, and incorporate hallmark features of, Colonial architecture. . . . Any remaining similarities, of which there are few, are *de minimus* in light of the vast dissimilarities between the works." *Id.* The Second Circuit agreed, noting that

> [m]any of the similarities are a function of consumer expectations and standard house design generally. Plaintiff can get no credit for putting a closet in every bedroom, a fireplace in the middle of an exterior wall, and kitchen counters against the kitchen walls. Furthermore, the overall footprint of the house and the size of the rooms are "design parameters" dictated by consumer preferences and the lot the house will occupy, not the architect.

> Finally, most of the similarities between [Zalewski's] and
> Defendants' designs are features of all colonial homes, or houses
> generally. So long as [Zalewski] was seeking to design a colonial
> house, he was bound to certain conventions. He cannot claim
> copyright in those conventions.

*Zalewski*, 754 F.3d at 106; *see also Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996)

(affirming grant of summary judgment for copyright defendant because "any similarity in the

theme of the parties' works relates to the unprotectible idea of a dinosaur zoo," and "[o]nce one

goes beyond this level of abstraction, the similarity in themes disappears").

The Court believes that *Zalewski* is distinguishable from the present case. As an initial

matter, the Court notes that Plaintiff's designs do not appear to be influenced by, and incorporate

hallmark features of, a particular style of architecture. Indeed, Defendants do not argue that

either Plaintiff's designs or their buildings were designed based upon a particular style, such as

the colonial style discussed in *Zalewski*.

Moreover, unlike the defendants in *Zalewski*, Defendants here have copied, with very

limited exception, every aspect of Plaintiff's designs. The Second Circuit noted in *Zalewski* that

"*[o]nly very close copying would have taken whatever actually belonged to [Zalewski]*. . . .

*Copying that is not so close would–and in this case did–only capture the generalities of the style*

*which [Zalewski] worked and elements common to all homes.*" *Id.* at 107 (emphasis added); *see*

*also Zalewski*, 875 F. Supp. 2d at 148 (noting that "the narrow scope of protectable expression

necessitates that plaintiffs show something akin to 'near identity' between the works in question

to prevail"); *Apple Comput., Inc. v. Microsoft Corp.* 35 F.3d 1435, 1439 (9th Cir. 1994) (holding

that "the appropriate standard for illicit copying [of works compromised of only unprotectable or

licensed elements] is virtual identity"); *Feist*, 499 U.S. at 349 (requiring the "same selection and

arrangement" to demonstrate infringement of a compilation). Here, Defendants do not argue that they copied only the unprotected "generalities" of Plaintiff's designs. Rather, the undisputed facts indicate that the buildings at Vly Point, Admiral's Walk, and Jordan Point were built almost exactly from Plaintiff's designs.

More specifically, with respect to Vly Point, it is undisputed that Defendant Kazmierczak made only minor modifications to Plaintiff's design, including adding a master bedroom to certain units and a walkout basement. Similarly, the only changes made to the Admiral's Walk design were to make it a five unit building instead of a ten unit building as well as modifying technical details to make the design "buildable." In fact, Defendant Kazmierczak testified that he did not change the overall design intent of the building or the way that the building looked. (Dkt. No. 93, Attach. 13, at 34:10-36:3 [Kazmierczak Dep.].) With regard to Jordan Point, it is undisputed that Defendant Kazmierczak made only minor layout changes to Plaintiff's design as well as changes to the firewall protection but the layout "pretty much stayed the same." (*Id.* at 40:19-41:2.)

Finally, the Court finds that the overall configuration of Plaintiff's designs meet the low threshold of creativity required for protection under the Copyright Act. During his deposition, Plaintiff gave detailed reasons as to why the overall configurations of the Vly Point and Patroon Point designs are uniquely his own, and the Court agrees. (Dkt. No. 93, Attach. 8, at 142:12-144:11 [Vly Point]; Dkt. No. 93, Attach. 9, at 167:24-169:3 [Patroon Point].) This evidence is both admissible and material. "While its components may look like those in many other modern homes, the [designs'] gestalt–its overall feeling, shape and arrangement of spaces, windows, and doors–help to distinguish it from those other homes." *Axelrod & Cherveny Architects, P.C. v.*

*Winmar Homes*, 05-CV-0711, 2007 WL 708798, at *11 (E.D.N.Y. Mar. 6, 2007). In response, once again, Defendants failed to submit admissible record evidence (such as an expert affidavit) controverting Plaintiff's evidence. Nor have they even pointed to other designs or styles that dispute the originality of Plaintiff's designs.

For all of these reasons, the Court finds that, based on the current record, a rational fact finder could conclude only that Defendants' use of Plaintiff's designs was wrongful. *See Winmar Homes*, 2007 WL 708798, at *13-14 (finding, as a matter of law, that two works were substantially similar where homes that were built were substantially similar, if not "virtually identical," to designs).

### b. Defendants Paul Hodorowski, J. Luk Construction Co., and Stephen Lamb

Plaintiff has failed to submit any evidence that Defendants Paul Hodorowski, J. Luk Construction Co., or Stephen Lamb committed any of the infringing acts. As discussed above, it is undisputed that Paul Hodorowski worked in the field doing punch-list items, served as the sales liaison for Vly Point, and served as both an estimator and sales liaison for Jordan Point. These positions do not suggest that Paul Hodorowski either copied, or was involved in the decisions to use, Plaintiff's designs. According to Adirondack's responses to Plaintiff's interrogatories, Paul Hodorowski was not involved with the Admiral's Walk project and Plaintiff has failed to submit evidence refuting this assertion. (Dkt. No. 93, Attach. 5, at Resp. to Interrog. No. 1 [Adirondack's Resp. to Pl.'s Interrog.].) Similarly, although Paul Hodorowski is part owner of J. Luk Construction, Adirondack's response to Plaintiff's interrogatories indicates that J. Luk Construction was not involved in any of the three projects. (*Id.*) Once again, Plaintiff has

not argued or submitted evidence to the contrary. While Paul Hodorowski eventually became part owner of Hodorowski Homes, this did not occur until sometime in 2012, which is well after Plaintiff's designs were copied.

With respect to Stephen Lamb, no evidence has been submitted regarding his involvement in the infringement activities. According to Plaintiff, Defendant Lamb is an independent contractor that "typically" stamped Defendant Kazmierczak's designs. (Dkt. No. 93, ¶ 18 [Mead Aff.].) Nothing in Plaintiff's Amended Complaint or his opposition to Northstar's motion suggests that Defendant Lamb stamped the designs at issue, or was otherwise involved, in the present case.

For these reasons, Plaintiff's copyright infringement claims are dismissed as to Defendants Paul Hodorowski, J. Luk Construction, and Stephen Lamb.

### c. C.B. Prime and Defendant Raymond

C.B. Prime argues, in part, that it did not unlawfully copy Plaintiff's designs because it did not copy Plaintiff's technical drawings or use the drawings to construct a building. (Dkt. No. 98, Attach. 2, at 14-15 [C.B. Prime's Mem. of Law].) Rather, C.B. Prime argues that it used only "very basic" drawings in its marketing materials. (*Id.*) However, "copyright protection extends to simplified floor plans, that is, promotional cut sheets, of copyright architectural plans." *John Wieland Homes & Neighborhoods, Inc. v. Poovey*, 03-CV-0168, 2004 WL 2108675, at *5 (W.D.N.C. Aug. 2, 2004); *see also Axelrod & Cherveny, Architects, P.C. v. T. & S. Buildings Inc.*, 943 F. Supp. 2d 357, 364 (E.D.N.Y. 2013) (holding that "defendants' copying of plaintiffs' copyrighted floor plans from the Georgetown II Brochure for use in defendants' advertisements and contracts of sale for homes with substantially similar designs constituted copyright

infringement"); *Arthur Rutenburg Corp. v. Parrino*, 664 F. Supp. 479, 481 (M.D. Fla. 1987) (holding that "[t]he Defendants' argument [that copyright protection did not extend to simplified floor plan depicted on promotional brochure which was not registered independently of the actual plans] is without merit"); *Imperial Homes Corp. v. Lamont*, 458 F.2d 895, 899 (5th Cir. 1972) (finding copyright protection extends to copies of floor plans contained in sales brochure, even when brochure itself was unregistered); *accord*, *Ronald Frederick Evans v. Cont'l Homes, Inc.*, 785 F.2d 897, 904-05 (11th Cir. 1986). Accordingly, because it is undisputed that C.B. Prime used Plaintiff's drawings in its advertisements to market and sell the subject properties without Plaintiff's permission, C.B. Prime is liable for infringement, pending the Court's consideration of C.B. Prime's affirmative defenses below.

With respect to Defendant Raymond individually, the Court finds that Plaintiff has failed to submit admissible record evidence demonstrating that Defendant Raymond participated in, or had knowledge of, any infringing activity at the time Plaintiff's designs were being impermissibly used for construction. Defendant Raymond testified at his deposition that he was responsible for marketing the properties and was not involved in the design or construction of Admiral's Walk, Vly Point or Jordan Point. (Dkt. No. 100, Attach. 7, at 7:6-20; 12:18-13:19; 15:3-16:21; 21:7-17; 25:15-26:4; 28:8-12 [Raymond Dep.].) Furthermore, Defendant Raymond testified that he did not participate in selecting the building designs and was unaware of any issues concerning Plaintiff's designs or that they may have been used without permission. (*Id.* at 13:15-15:14; 18:21-19:16; 21:7-22; 23:14:20; 25:10-26:8; 31:3-18.)

In opposition to Defendant Raymond's motion, Plaintiff argues that Defendant Raymond is vicariously liable for the infringement of his designs and that Defendant Raymond was aware

of the infringing activity because he sent a cease-and-desist letter, dated July 17, 2008, to Capital Development Group. (Dkt. No. 109, Attach. 10, at 6-7 [Pl.'s Opp'n Mem. of Law].) Plaintiff's argument is flawed, however, because vicarious liability is a form of secondary liability and is not the equivalent of direct infringement. *See Wu v. John Wiley & Sons, Inc.*, 14-CV-6746, 2015 WL 5254885, at *13 (S.D.N.Y. Sept. 10, 2015) (stating that, "[c]ourts in this Circuit routinely address contributory and vicarious copyright infringement as separate claims from direct infringement" and that, "in order to establish liability for contributory or vicarious copyright infringement, a plaintiff must first prove that direct infringement of its works occurred"). Finally, Plaintiff's cease-and-desist letter was addressed to the Town of Niskayuna and there is no evidence that it was also sent to Defendant Raymond or Capital Development Group.[8] (Dkt. No. 101, Attach. 6, at 44-45 [Ex. "Y"].)

### B. Whether Defendants Had Implied Non-Exclusive Licenses to Use Plaintiff's Designs

After carefully considering the matter, the Court answers this question in the negative for the reasons set forth below.

Defendants argue that Plaintiff's infringement claims must be dismissed because ADG had an implied non-exclusive license to (1) use Plaintiff's designs to complete the Vly Point and Admiral's Walk projects after Plaintiff's employment was terminated, and (2) use Plaintiff's Patroon Point designs to build the first four buildings at Jordan Point. (Dkt. No. 110, at 8-14 [Adirondack's Opp'n Mem. of Law]; Dkt. No. 101, Attach. 9, at 10-16 [Adirondack's Mem. of

---

[8] The Court notes that Plaintiff has referenced other cease-and-desist letters allegedly sent to ADG in his Rule 7.1 Statement. (Dkt. No. 94, Attach. 21, ¶¶ 39, 75 [Pl.'s Rule 7.1 Statement].) However, the record citations provided by Plaintiff do not support his assertion that cease-and-desist letters were sent to any of the Defendants.

Law]; Dkt. No. Dkt. No. 97, Attach. 15, at 3-4 [Northstar's Mem. of Law]; Dkt. No. 98, Attach. 2, at 7-10 [C.B. Prime's Mem. of Law].)

"A claim for infringement will fail if the challenged use of the copyrighted work is authorized by a license." *Wu v. Pearson Educ. Inc.*, 10-CV-6537, 2013 WL 145666, at *4 (S.D.N.Y. Jan. 11, 2013) (citing *Graham v. James*, 144 F.3d 229, 236 [2d Cir. 1998]); *see also Davis*, 505 F.3d at 100 (holding that "[a] valid license . . . immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor"). "There are two general categories of licenses: non-exclusive licenses, which permit licensees to use the copyrighted material and may be granted to multiple licensees; and exclusive licenses, which grant to the licensee the exclusive right—superior even to the copyright owners' rights—to use the copyright material in a manner as specified by the license agreement." *Davis*, 505 F.3d at 99. "Under federal law, 'nonexclusive licenses may . . . be granted orally, or may even be implied from conduct.'" *Graham*, 144 F.3d at 235 (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.03[A][7], at 10-43). However, "defendants must show that there was a meeting of the minds as determined by contract law." *Pavlica v. Behr*, 397 F. Supp. 2d 519, 526 (S.D.N.Y. 2005).

Significantly,

> [a]lthough the Second Circuit has not yet ruled on the precise circumstances under which an implied non-exclusive license will be found, our Circuit has followed the lead of other appeals courts and cautioned that implied non-exclusive licenses should be found "'only in narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'"

*Weinstein Co. v. Smokerwood Entm't Grp., LLC*, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009)

(quoting *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.*, 211 F.3d 21, 25 [2d Cir. 2000]).  In other words, "in order to establish that the author of a copyright work has given an implied nonexclusive license, the putative licensee must show: (1) the licensee requested the creation of a work; (2) the author (licensor) made that particular work and delivered it to the licensee who requested it; and (3) the licensor intended that the licensee copy and distribute the work." *Lighthouse Sols., LLC v. Connected Energy Corp.*, 03-CV-6275, 2004 WL 1811391, at *4 (W.D.N.Y. Aug. 13, 2004) (citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 [7th Cir. 1996]).

This three-prong test, which originated in the Ninth Circuit in *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990), "often appears in the context of architectural designs." *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 120 (S.D.N.Y. 2012).  Indeed, the Ninth, Seventh, Sixth, Fourth, and First Circuits have had occasion to apply this test with regard to architectural designs.  *Shaver*, 74 F.3d at 768; *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 827-28 (9th Cir. 2001); *Johnson v. Jones*, 149 F.3d 494, 500-01 (6th Cir. 1998); *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505 (4th Cir. 2002); *John G. Danielson, Inc. v. Winchester-Conant Props, Inc.*, 322 F.3d 26 (1st Cir. 2006).  As the First Circuit noted, "[t]hese cases reached different results on their individual facts: *Foad Consulting* and *I.A.E.* found licenses while *Nelson-Salabes* and *Johnson* did not.  But they all applied a similar framework, and we will follow their lead." *John G. Danielson*, 322 F.3d at 40.  Although the Second Circuit has not expressly endorsed this framework, the Court will follow the lead of other Circuit courts in applying this framework in order to determine whether an implied non-exclusive license existed.

Accordingly, in applying the *Effects Assocs.* test to the present matter, it is evident that the first two prongs are not in dispute. Instead, it is reasonably clear that Adirondack requested Plaintiff to create designs for the three projects and Plaintiff delivered those designs to ADG. Thus, the determinative inquiry is whether Plaintiff intended his drawings to "be used on the project for which they were created, independent of the creator's involvement." *Nelson-Salabes*, 284 F.3d at 515. The First Circuit has held that this inquiry is not a "subjective inquiry into the mind of the putative licensor." *John G. Danielson, Inc. v. Winchester–Conant Props., Inc.*, 322 F.3d 26, 42 (1st Cir. 2003). "Rather, it is an objective inquiry into facts that manifest such contractual intent." *John G. Danielson*, 322 F.3d at 42. Furthermore, the Fourth Circuit has developed a non-exclusive list of the following three factors to consider when analyzing the architect's objectively manifested intent:

> Our analysis of these decisions . . . suggests that the existence of an implied nonexclusive license in a particular situation turns on at least three factors: (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts, such as the standard AIA contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*Nelson-Salabes*, 284 F.3d at 516; *accord*, *John G. Danielson*, 322 F.3d at 41; *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008); *Ahadams & Co., P.C. v. Spectrum Health Servs., Inc.*, 40 F. Supp. 3d 456, 462-63 (E.D. Pa. 2014). With these principles in mind, the Court turns to its analysis of the issues in the present case.

1.      **Vly Point**

The Court finds that the *Nelson-Salabes* factors do not support Defendants' argument that Plaintiff granted ADG and/or Northstar an implied non-exclusive license to continue using his designs for Vly Point without his involvement.  With respect to the first factor, Plaintiff had been working on the Vly Point project for years helping to develop several phases of the project, and, thus, his involvement cannot be seen as being discrete or short-term.

In regard to the second factor, the parties executed a standard AIA contract.  (Dkt. No. 101, Attach. 5, at 43 [Vly Point Contract].)  In article 6, section 6.1, the contract provides that Plaintiff shall be deemed author of the documents and other drawings prepared for Vly Point and shall retain all rights to said documents, including copyrights.  (*Id.* at 48.)  Furthermore, section 6.3 of the contract states that

> The Owner shall not use or authorize any other person to use the Architect's instruments of service on other projects, for additions to this Project or for the completion of this Project by others so long as the Architect is not adjudged to be in default under this Agreement except by agreement in writing and with appropriate compensation to the architect.

(*Id.*)  Finally, sections 6.2 and 11.4 set forth the terms for reuse of Plaintiff's designs and the fee to be paid for such reuse.  (*Id.* at 53.)

The Court notes that, in *John G. Danielson*, the First Circuit considered an identical provision to section 6.3 and concluded that it was evidence pointing away from a license.  *John G. Danielson*, 322 F.3d at 41.  Granted, reading the contract as a whole, the Court finds that Plaintiff must have at least granted Adirondack a limited license to copy and use the original designs for construction of building units.  As other Courts have found, if it were otherwise, the designs "would be utterly useless to [a project owner] unless it had permission to use the

[designs] for construction of the townhouses and to make copies for its contractors as needed."

*Thomas M. Architects, P.C. v. Accent Builders & Developers, LLC*, 377 F. App'x 303, 308 (4th

Cir. 2010); *see also Effects Assocs*, 908 F.2d at 558-59 (noting that "[t]o hold that Effects did not

at the same time convey a license to use the footage in 'The Stuff' would mean that plaintiff's

contribution to the film was 'of minimal value,' a conclusion that can't be squared with the fact

that Cohen paid Effects almost $56,000 for this footage"); *accord*, *Shaver*, 74 F.3d at 777.  It is

apparent that ADG paid Plaintiff $64,104.00[9] of the $67,360.00 owed under the contract for his

basic services on Vly Point.  (Dkt. No. 101, Attach. 5, at 52 [Vly Point Contract].)  Accordingly,

it would be illogical to hold that ADG could no longer use the designs for which they were

originally intended after paying this sum of money because it decided to no longer use Plaintiff's

services.  *See Shaver*, 74 F.3d at 772 (noting district court's finding that, after an airport paid

$10,000 for a schematic design for a hangar building, architect's argument "that the Airport can

use the drawings only as pieces of paper (wallhangings? placemats?) is untenable"); *Foad*

*Consulting*, 270 F.3d at 829, n.12 (noting that, to find a non-exclusive license had not been

granted "would allow architectural or engineering firms to hold entire projects hostage, forcing

the owner either to pay the firm off, continue to employ it, or forgo the value of all work

---

[9]     Both Adirondack and C.B. Prime assert this fact in their respective Rule 7.1
statements.  (Dkt. No. 101, Attach. 10, ¶ 11 [Adirondack's Rule 7.1 Statement]; Dkt. No. 98,
Attach. 1, ¶ 5 [C.B. Prime's Rule 7.1 Statement].)  In support, both parties rely on allegations in
Plaintiff's complaint filed in an underlying state court action in which Plaintiff alleges this fact
and Adirondack does not dispute it.  (Dkt. No. 101, Attach. 1, at 55, ¶ 98 [Ex. "B" to Dowd
Decl.].)  However, Plaintiff now disputes this fact and contends that he was paid only "a fraction
of the money" he is allegedly owed for the Vly Point project.  (Dkt. No. 109, Attach. 13, ¶ 5
[Pl.'s Rule 7.1 Response to C.B. Prime's Rule 7.1 Statement].)  In support, Plaintiff cites his
affidavit.  (*Id.*)  However, the affidavit does not explicitly refute this fact and states only that he
is owed an outstanding amount of $67,416.00 but does not articulate what this amount
encompasses.  (Dkt. No. 109, Attach. 8, ¶¶ 12, 15 [Ranieri Aff.].)  According to Plaintiff's
affidavit, this amount may include the outstanding balance owed under the contract as well as
charges for reuse fees and additional services.  (*Id.*, ¶ 12.)  Therefore, the Court finds that
Plaintiff has failed to cite record evidence controverting the above-stated fact.

completed so far and start from scratch."); *Ahadams & Co., P.C.*, 40 F. Supp. 3d at 465 (noting that, "[i]f the Court agreed with AHAdams's assertion that it did not grant an implied nonexclusive license, then the illogical result would be that Spectrum Health would have paid a large amount of money for Drawings it could not use only upon compulsion to continue doing business with AHAdams").

Furthermore, although the contract expressly reserves ownership of Plaintiff's copyright in the designs, this is not dispositive of the licensing issue. *See Thomas M. Gilbert Architects*, 377 F. App'x at 308 (stating that "an express reservation of ownership in the Plans' copyright is not dispositive of the licensing issue"). Rather, "at a minimum it evinces an intent to grant, at best, a limited license." *Id.*

Notwithstanding the above, section 6.3 of the contract is clear that Adirondack did not have permission to allow a new architect to complete Vly Point using Plaintiff's designs, even if such use was strictly for Adirondack's benefit. *See Compliance Source, Inc. v. GreenPoint Mortg. Funding, Inc.*, 624 F.3d 252, 259 (5th Cir. 2010) (holding that prior case precedent does not "permit a court to look past the actual language of a licensing agreement and absolve a licensee who grants third-party access merely because that access is on behalf of, or inures to the benefit of, the licensee"). Moreover, as discussed in Point I.A. of this Decision and Order, Defendant Kazmierczak made minor modifications to some of Plaintiff's designs, including the addition of a master bedroom and a walkout basement. Although the modified drawings referenced "Dominick Ranieri Architect, P.C.," Defendant Kazmierczak labeled these designs as being owned by ADG and having been drawn by Northstar. (Dkt. No. 94, Attachs. 2 & 3.) As the Sixth Circuit noted in *Johnson*

> It is one thing for an architect to allow the owner to hire someone
> else to build a house from the architect's plans. It is quite another
> for the architect to allow a competitor to come in and claim the
> architect's work as his own. Put simply, Johnson's drawings were
> used in a way he never intended–i.e., a rival architect claimed them
> as his own work and completed the Jones house without Johnson's
> involvement.

*Johnson*, 149 F.3d at 501. Similarly, it is clear that Plaintiff's designs in the present case were used in a way that Plaintiff never intended.

Adirondack argues that it was permissible to retain Defendant Kazmierczak to complete Vly Point because Plaintiff was in breach of the contract. (Dkt. No. 110, at 13 [Adirondack's Opp'n Mem. of Law]; Dkt. No. 117, at 15-16 [Adirondack's Reply Mem. of Law].) In support, Adirondack cites language from section 6.3, which prohibits others from completing the project "so long as the Architect is not adjudged to be in default under this Agreement." (*Id.*) The Court is unpersuaded by this argument because Adirondack has failed to demonstrate that Plaintiff was *adjudged*[10] to be in default of the agreement.

Finally, with respect to the third *Nelson-Salabes* factor, courts "look to whether the supposed infringer obtained the plans directly from the supposed licensor, which would suggest permission to use them." *John G. Danielson*, 322 F.3d at 42. Although ADG received the designs directly from Plaintiff, it is undisputed that Plaintiff advised ADG it could no longer use them when he was terminated.

For all of these reasons, the Court finds that a non-exclusive license was not granted to Adirondack or Northstar with respect to this project.

---

[10]     According to Black's Law Dictionary, "adjudge" means to "pass upon judicially, to decide, settle, or decree; to sentence or condemn." Black's Law Dictionary, http://thelawdictionary.org/adjudge/ (last visited January 4, 2016).

## 2. Admiral's Walk

The Court finds that the *Nelson-Salabes* factors do not support Defendants' argument that Plaintiff granted ADG and/or Northstar an implied non-exclusive license to continue using his designs for Admiral's Walk without his involvement. With respect to the first factor, Plaintiff had been working on the Admiral's Walk project for approximately two years and was retained to help with different design phases of the project. Accordingly, his involvement cannot be seen as having been discrete or short-term. Therefore, this factor does not itself support the assertion that Plaintiff granted ADG a non-exclusive license.

With respect to the second *Nelson-Salabes* factor, Plaintiff did not formally use an AIA contract when he contracted with ADG to perform work for Admiral's Walk. Rather, a letter contract was used, which does not contain any provisions providing that copyrighted materials could be used only with Plaintiff's future involvement or express permission. (Dkt. No. 101, Attach. 6, at 9-11 [Admiral's Walk Contract].) However, the second paragraph of the contract states that, "[i]f accepted, this letter will establish the terms of agreement to be applied to a standard form of agreement published by the American Institute of Architects." (*Id.* at 9.) Plaintiff gave conflicting deposition testimony as to whether a subsequent AIA contract was executed. (Dkt. No. 101, Attach. 3, at 46:6-21 [Ex. "J" to Adirondack's Mem. of Law]; Dkt. No. 93, Attach. 8, at 53:13-20 [Ex. "G" to Pl.'s Mem. of Law].) Plaintiff indicated that, at the very least, an AIA agreement was created but could not recall if it was executed by ADG. (Dkt. No. 93, Attach. 8, at 53:13-20 [Ex. "G" to Pl.'s Mem. of Law].)

Nevertheless, the executed letter contract provides that the letter contract's acceptance establishes an agreement to apply the terms of a standard form AIA agreement. In addition,

Plaintiff and ADG executed AIA agreements in their prior dealings for both the Patroon Point

and Vly Point projects, indicating that Plaintiff regularly intended to use the AIA provisions.

Finally, the Fourth and Sixth Circuits have considered unexecuted contracts in determining an

architect's intent when deciding whether an implied non-exclusive license was granted.  *See*

*Nelson-Salabes*, 284 F.3d at 516 (considering unsigned AIA contract where architect had asked

client to execute it); *Johnson*, 149 F.3d at 500 (considering unsigned AIA contracts as evidence

of intent); *accord*, *Ahadams*, 40 F. Supp. 3d at 463.  Accordingly, the Court will consider the

relevant standard AIA provisions used in the Patroon Point contract for purposes of determining

whether Plaintiff intended to grant an implied non-exclusive license with regard to Admiral's

Walk.  These provisions provide as follows:

> 1.3.2.1  The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and reserved rights, including copyrights.
>
> 1.3.2.2  Upon execution of this Agreement, the Architect grants to the Owner a nonexclusive license to reproduce the Architect's Instruments of Service solely for purposes of constructing, using and maintaining the Project. . . . **Any termination of this Agreement prior to completion of the Project shall terminate this license**.  Upon such termination, the Owner shall refrain from making further reproductions of Instruments of Service and shall return to the Architect within seven days of termination all originals and reproductions in the Owner's possession or control. **If and upon the date the Architect is adjudged in default of this Agreement, the foregoing license shall be deemed terminated and replaced by a second, nonexclusive license permitting the Owner to authorize other similarly credentialed design professionals to reproduce and, where permitted by law, to make changes, corrections or additions to the Instruments of Service solely for purposes of completing, using and maintaining the Project**.

**1.3.2.3  The Owner shall not assign, delegate, sublicense, pledge or otherwise transfer any license granted herein to another party without the prior written agreement of the Architect**.

(Dkt. No. 101, Attach. 6, at 17 [Ex. "U" to Adirondack's Mem. of Law]; Dkt. No. 94, Attach. 8 [Ex. "Q" to Pl.'s Mem. of Law]) (emphasis added).

Based upon the language in these provisions, it is clear that Plaintiff intended that a third-party be allowed to complete work on the project or make changes to his designs in only two situations: (1) if Plaintiff is adjudged in default of the Agreement (§ 1.3.2.2), or (2) if Plaintiff gave prior written consent (§ 1.3.2.3).  As discussed in the preceding section, Defendants have not submitted any evidence that Plaintiff was adjudged in default of the Agreement. Furthermore, Defendants have not submitted any evidence that Plaintiff gave written consent allowing Defendant Kazmierczak to complete the project or modify his drawings.  Finally, section 13.2.2 states that the non-exclusive license granted to Adirondack to reproduce Plaintiff's designs would be terminated if the Agreement was terminated before the completion of the project, which it was.

Finally, as discussed in the preceding section, ADG obtained the Admiral's Walk designs directly from Plaintiff.  However, Plaintiff advised ADG it could no longer use his designs when his employment was terminated.  Therefore, the third *Nelson-Salabes* factor does not support the finding of an implied non-exclusive license.

For all of these reasons, the Court finds that Plaintiff did not intend to grant Adirondack or Northstar a non-exclusive license to complete Admiral's Walk without his involvement or to modify his designs.

### 3.    Patroon Point & Jordan Point

The Court finds that the *Nelson-Salabes* factors do not support Defendants' argument that Plaintiff granted ADG and/or Northstar an implied non-exclusive license to use his designs for Patroon Point on the Jordan Point project.  With respect to the second factor, section 1.3.2.1 of the Patroon Point contract states that "[d]rawings, specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service **for use solely with respect to this Project**." (Dkt. No. 101, Attach. 6, at 17 [Ex. "U" to Adirondack's Mem. of Law]) (emphasis added).  Similarly, section 1.3.2.2 states that, "[u]pon execution of this Agreement, the Architect grants to the Owner a nonexclusive license to reproduce the Architect's Instruments of Service **solely for purposes of constructing, using and maintaining the Project**." (*Id.*) (emphasis added).  Finally, section 1.3.2.3 states that "[t]he Owner shall not use the Instruments of Service for future additions or alterations to this Project **or for other projects**, unless the Owner obtains the written agreement of the Architect and the Architect's consultants."  (*Id.*) (emphasis added).  Clearly, Adirondack's admitted use of Plaintiff's Patroon Point designs to build the first four buildings at Jordan Point without Plaintiff's knowledge or consent was in violation of these provisions and not pursuant to a license.

Adirondack argues that it was granted a non-exclusive license because, according to Francis J. Hodorowski, Plaintiff had expressed a desire to develop his own catalogue of design plans which builders, including ADG, could use for projects in exchange for payment of a reuse fee.  (Dkt. No. 117, at 12-13 [Adirondack's Reply Mem. of Law].)  In support of this argument, Adirondack argues that Plaintiff had submitted one of his plans from Vly Point to be considered for the Jordan Point project.  (*Id.* at 13.)  However, Mr. Hodorowski admitted that he never paid

Plaintiff a reuse fee for the Patroon Point designs. (Dkt. No. 93, Attach. 12, at 83:18-22 [Ex. "I" to Pl.'s Mem. of Law].) Even setting aside this failure, the Court is unpersuaded by this argument because, as stated above, the inquiry is not "a subjective inquiry into the mind of the putative licensor. Rather, it is an objective inquiry into facts that manifest such contractual intent." *John G. Danielson*, 322 F.3d at 42; *see also Nat'l Ass'n For Stock Car Auto Racing, Inc. v. Scharle*, 184 F. App'x 270, 275 (3d Cir. 2006) (stating that "[w]hether there is an implied license is determined by an objective inquiry into the facts; *the private hopes of the creator are not relevant*") (emphasis added). The objective evidence, as indicated by the above-described contract provisions, clearly demonstrates that Plaintiff did not intend for his designs to be used on subsequent projects without his knowledge or consent.

Finally, although Plaintiff provided his designs to ADG for purposes of constructing Patroon Point, Plaintiff did not provide the designs for use on a subsequent project without his knowledge or consent. Accordingly, the third *Nelson-Salabes* factor does not support the finding of an implied non-exclusive license.

For all of these reasons, the Court finds that Defendants have failed to demonstrate that Plaintiff granted ADG an implied non-exclusive license to use his Patroon Point designs on the Jordan Point project.

### C. Whether Plaintiff's Copyright Infringement Claims Are Time-Barred

A civil copyright infringement action must be commenced "within three years after the claim accrued." 17 U.S.C. § 507(b). The Second Circuit recently adopted the "discovery rule" under which "copyright infringement claims do not accrue until actual or constructive discovery of the relevant infringement." *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 125 (2d Cir. 2014). Moreover, according to the Supreme Court,

It is widely recognized that the separate-accrual rule attends the copyright statute of limitations. Under that rule, when a defendant commits successive violations, the statute of limitations runs separately from each violation. Each time an infringing work is reproduced or distributed, the infringer commits a new wrong. Each wrong gives rise to a discrete "claim" that "accrue[s]" at the time the wrong occurs. In short, each infringing act starts a new limitations period.

Under the Act's three-year provision, an infringement is actionable within three years, and only three years, of its occurrence. And the infringer is insulated from liability for earlier infringements of the same work. Thus, when a defendant has engaged (or is alleged to have engaged) in a series of discrete infringing acts, the copyright holder's suit ordinarily will be timely under § 507(b) with respect to more recent acts of infringement (i.e., acts within the three-year window), but untimely with respect to prior acts of the same or similar kind.

*Petrella v. Metro–Goldwyn–Mayer, Inc.*, 134 S. Ct. 1962, 1969-70 (2014); *see also Stone v. Williams*, 970 F.2d 1043, 1049-50 (2d Cir. 1992) (holding that "[e]ach act of infringement is a distinct harm giving rise to an independent claim for relief . . . . Recovery is allowed only for those acts occurring within three years of suit, and is disallowed for earlier infringing acts"). Finally, a defendant bears the burden of proof when raising a statute of limitations argument as an affirmative defense in the face of a copyright infringement claim. *U.S. v. Livecchi*, 711 F.3d 345, 352 (2d Cir. 2013).

### 1.     Admiral's Walk & Vly Point

In the present case, Plaintiff filed his original Complaint on August 24, 2011. (Dkt. No. 1.) Therefore, any infringement claims that accrued before August 24, 2008, are untimely. Adirondack and C.B. Prime argue that Plaintiff knew, or should have known, that his copyrights were being infringed in 2007. (Dkt. No. 98, Attach. 2, at 20-21 [C.B. Prime's Mem. of Law];

Dkt. No. 101, Attach. 9, at 16-20 [Adirondack's Mem. of Law].) Specifically, according to C.B. Prime, Plaintiff knew in April of 2007 that ADG would no longer pay Plaintiff for his designs. (Dkt. No. 98, Attach. 2, at 21 [C.B. Prime's Mem. of Law].) Furthermore, C.B. Prime argues that Plaintiff admits in his Amended Complaint that he was aware of ADG's unlawful use of his designs in August of 2007, causing him to send a cease-and-desist letter to both ADG and municipal authorities. (*Id.*)

Similarly, Adirondack argues that Plaintiff's demand that ADG no longer use his designs during the April 2007 meeting, followed by his cease-and-desist letters, indicate that Plaintiff was concerned about ADG continuing to use his designs. (Dkt. No. 101, Attach. 9, at 18 [Adirondack's Mem. of Law].) According to Adirondack, a reasonably diligent person in Plaintiff's position would have investigated ADG's activities further, especially because Plaintiff was aware that ADG was in possession of his designs and needed to complete Admiral's Walk and Vly Point. (*Id.*) In addition, Adirondack notes that Plaintiff produced a final invoice, dated January 28, 2008, regarding the completion of his services for Admiral's Walk and filed a mechanic's lien on the project on June 30, 2008. (*Id.* at 19.)

Finally, Adirondack argues that Plaintiff admits in his Amended Complaint that he was aware that ADG had started work on two new buildings at Vly Point at the time of his termination in April 2007. (*Id.*) Adirondack has also submitted building and zone permits for both Admiral's Walk and Vly Point, which indicate that all but two of the permits for Admiral's Walk were issued prior to July 11, 2008, and all the permits for Vly Point were issued before August 24, 2008. (Dkt. No. 101, Attach. 7, at 5-33.) Adirondack further argues that eighteen units at Admiral's Walk were constructed and sold before August 24, 2008, and only seventeen

units had yet to be sold at Vly Point by this date.  (Dkt. No. 117, at 19 [Adirondack's Reply

Mem. of Law].)  Based upon these facts, Adirondack argues that Plaintiff either knew, or should

have known, of any alleged infringing acts more than three years before commencing this action.

The Court is unpersuaded that Plaintiff's infringement claims are time-barred for the

following three reasons.  First, it appears that Defendants are arguing that Plaintiff had "inquiry

notice," i.e., "knowledge that would have led a reasonable person to start investigating the

possibility that his rights had been violated." *Chicago Bldg. Design, P.C. v. Mongolian House,

Inc.*, 770 F.3d 610, 615 (7th Cir. 2014).  However, "'inquiry notice' is not the same as actual or

constructive discovery." *Chicago Bldg. Design*, 770 F.3d at 615.  Indeed, the Supreme Court has

stated that

> [i]n determining the time at which "discovery" of those "facts"
> occurred, terms such as "inquiry notice" and "storm warnings" may
> be useful to the extent that they identify a time when the facts
> would have prompted a reasonably diligent plaintiff to begin
> investigating. But the limitations period does not begin to run until
> the plaintiff thereafter discovers or a reasonably diligent plaintiff
> would have discovered "the facts constituting the violation" . . .
> irrespective of whether the actual plaintiff undertook a reasonably
> diligent investigation.

*Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010).

Similarly, the mere fact that Plaintiff's services were terminated by ADG, that ADG

retained possession of Plaintiff's designs, and Plaintiff informed ADG that it could no longer use

his designs, does not mean that a reasonably diligent person would have investigated ADG's

activities further.  As the First Circuit has stated,

> There is no presumption that failed business relationships
> inevitably will give rise either to tortious conduct or disregard of
> proprietary rights.  That a relationship between an architect and a

> client has become frayed and the client has decided to forge ahead
> with the project by engaging some other architect does not, in and
> of itself, serve as a harbinger of an intention to violate the
> architect's copyright protection.

*Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 45 (1st Cir. 2008); *William A.*

*Graham Co. v. Haughey*, 568 F.3d 425, 439-40 (3d Cir. 2009) (stating that termination from

employment "itself cannot be considered a storm warning because a copyright owner does not

have a duty to ferret out potential acts of infringement before they occur[,]" and noting that

"possession of a copy of a work alone does not constitute copyright infringement or a storm

warning thereof").

Indeed, in the present case, as in *McTigue*, ADG advised Plaintiff that it would no longer

be using his designs after Plaintiff stated that it could no longer use them. (Dkt. No. 109, Attach.

8, ¶ 19 [Ranieri Aff].) Based upon this statement, it was Plaintiff's belief that ADG would stop

using his designs. (*Id.*, ¶¶ 26, 31.) Under these circumstances, the First Circuit has observed that

> the "[architect] specifically warned [the project owner] that the
> plans and drawings could not be used to complete the project. [The
> architect] has no reason to believe that [the project owner] might
> thumb his nose at this warning. Moreover, [the project owner's]
> reply—that the plans and drawings were 'useless' and had been
> 'discarded'—would have made a reasonable person in [the
> architect's] position more secure, not less secure, in a belief that
> infringement was an unlikely scenario."

*McTigue*, 531 F.3d at 45.

Second, it appears from Plaintiff's affidavit that he filed mechanic's liens in order to

protect his interests in light of his termination and the outstanding money he was allegedly owed

from the projects. (Dkt. No. 109, Attach. 8, ¶¶ 15-21 [Ranieri Aff].) Plaintiff states that these

steps were taken in contemplation of filing a breach-of-contract action in state court. (*Id.*, ¶ 32.)

Furthermore, although Plaintiff admits that he went to Admiral's Walk in July of 2008 and observed a building under construction that appeared similar to his designs, Plaintiff spoke with the town's building inspector to ensure that no permits would be issued using his designs. (*Id.*, ¶¶ 22-24.) Plaintiff subsequently sent cease-and-desist letters to memorialize this conversation and believed that no permits would be issued for Vly Point or Admiral's Walk that were based on his designs. (*Id.*, ¶¶ 25-26, 31.) According to Plaintiff, it was not until he commenced the breach-of-contract action in state court in June of 2009, and engaged in subsequent discovery with Defendants, that he learned of the alleged infringing acts. (*Id.*, ¶¶ 28-29.)

Third, and finally, Adirondack's argument regarding the dates on which permits were issued and the sale and construction of the units at Admiral's Walk and Vly Point is unavailing. Specifically, this argument implies that Plaintiff was either aware, or should have been aware, of these events occurring. However, as the First Circuit stated in *McTigue*, "[a]rchitects have no general, free-standing duty to comb through public records or to visit project sites in order to police their copyrights." *McTigue*, 531 F.3d at 46. Similarly, no evidence has been submitted in the present case that Plaintiff was actually aware that permits were continuing to be issued or that additional units were being sold or constructed based upon his designs. Because Plaintiff did not have a duty to police these alleged activities to ensure they were not occurring, and because no evidence has been presented indicating that Plaintiff should have been aware of these activities, the Court cannot find, as a matter of law, that Plaintiff had constructive notice of these acts.

Accordingly, construing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff did not have actual or constructive notice of any alleged infringing acts before June of 2009 (the date that he commenced a state court action).

## 2. Jordan Point

Adirondack argues that Plaintiff should be precluded from seeking monetary damages based upon any purported infringing acts with respect to Jordan Point that occurred before August 24, 2008. (Dkt. No. 101, Attach. 9, at 20 [Adirondack's Mem. of Law]; Dkt. No. 117, at 19-21 [Adirondack's Reply Mem. of Law].) In support of this argument, Adirondack argues that, on January 18, 2005, Plaintiff sent a communication to Dean DeVito, at the request of Defendant Francis J. Hodorowski, in which Plaintiff presented a footprint of a product that he was developing for Vly Point for consideration on Jordan Point. (Dkt. No. 117, at 20 [Adirondack's Reply Mem. of Law].) Adirondack argues that this communication, coupled with the fact that Plaintiff allegedly knew ADG had continued to use Plaintiff's plans for Admiral's Walk and Vly Point, demonstrates that Plaintiff should have known that ADG was using Plaintiff's plans from Patroon Point to construct buildings at Jordan Point. (*Id.* at 20-21.) Finally, Adirondack argues that Plaintiff is prohibited from seeking damages regarding Unit 27 on Jordan Point because this unit was constructed and sold more than three years before the commencement of this action. (*Id.*)

The Court finds the argument that Plaintiff should have known that ADG would use his Patroon Point design without permission because he had previously submitted a footprint for consideration on the project to be untenable. No reasonable person would suspect that his or her materials would be unlawfully copied several years after submitting them for consideration on a potential project. Furthermore, as discussed in the preceding section, Plaintiff did not have an obligation to monitor public records or visit project sites in order to police his copyrights. Therefore, the fact that Unit 27 was constructed and sold more than three years before the

commencement of this action is unavailing because no evidence has been submitted that Plaintiff was aware, or should have been aware, of that fact. Indeed, Plaintiff has filed an affidavit stating that he did not suspect any alleged infringement until the Fall of 2010, when he happened to drive by the construction site for Jordan Point and notice similarities to his designs. (Dkt. No. 109, Attach. 8, ¶ 4 [Ranieri Aff.].) It was at this time that Plaintiff filed a FOIL request to inspect the drawings on file for the project. (*Id.*, ¶¶ 5-6.) Adirondack has failed to submit competent evidence that refutes these assertions. Accordingly, Adirondack's motion requesting that Plaintiff's infringement claim with respect to Jordan Point be dismissed as time-barred is denied.

Finally, Adirondack argues that, should the Court find Plaintiff's claims with respect to Jordan Point are not time-barred, the Court should limit Plaintiff's damages to those expressly provided for in the Patroon Point agreement. (Dkt. No. 110, at 20-21 [Adirondack's Opp'n Mem. of Law].) More specifically, Adirondack argues that the Patroon Point agreement contained a reuse fee provision in which Plaintiff would be paid $1,150 per dwelling unit constructed based on his designs. (*Id.* at 20.) Adirondack argues that four buildings and eight units were constructed at Jordan Point and, therefore, Plaintiff's damages should be limited to $9,200 (i.e., $1,150 x 8 dwelling units). (*Id.* at 20-21.)

Adirondack's argument is without merit for the following two reasons. First, as discussed above in Point III.B.3. of this Decision and Order, the Patroon Point contract expressly provided that Plaintiff's designs were to be used solely for the Patroon Point project. (Dkt. No. 101, Attach. 6, at 17 [Ex. "U" to Adirondack's Mem. of Law].) Therefore, the reuse fee clearly does not apply to units constructed on different projects.

Second, Section 504 of the Copyright Act allows a copyright owner to recover actual damages and any additional profits of the infringer.  17 U.S.C. § 504.  Accordingly, Adirondack cannot limit potential damages to the terms contained in the Patroon Point contract.  *See Engel v. Wild Oats, Inc.*, 644 F. Supp. 1089, 1091 (S.D.N.Y. 1986) (stating that "[t]he victim of copyright infringement who seeks damages is entitled to choose between two remedies. She may pursue the actual damages she has suffered plus the infringer's additional profits; or she may elect statutory damages"); *accord*, *Millennium TGA, Inc. v. Leon*, 12-CV-1360, 2013 WL 5719079, at *9 (E.D.N.Y. Oct. 18, 2013).

**D.    Whether Defendants Can Be Held Liable for Contributory Copyright Infringement**

After carefully considering the matter, the Court answers this question in the affirmative with respect to the individual Adirondack Defendants except for Paul Hodorowski and J. Luk Construction.  However, the Court answers this question in the negative with respect to Defendants Kazmierczak, Northstar, Lamb, and Raymond.  Finally, the Court finds that triable issues of fact exist as to whether C.B. Prime knew, or should have known, of the infringing acts with regard to Vly Point and Jordan Point after Plaintiff filed suit and C.B. Prime continued to market the properties.

"To establish a claim for contributory copyright infringement, a plaintiff must allege that the defendant 'with knowledge of the infringing activity, induced, caused, or materially contributed to the infringing conduct of another.'" *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012) (quoting *Brought to Life Music, Inc. v. MCA Records, Inc.*, 02-CV-1164, 2003 WL 296561, at *2 [S.D.N.Y. Feb. 11, 2003]).  "The knowledge standard is an objective one; contributory infringement liability is imposed on persons who 'know or have

reason to know' of the direct infringement." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (quoting *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 [9th Cir. 2001]); *see also Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 154 (S.D.N.Y. 2009) (stating that "[t]he requisite knowledge for contributory infringement liability may be actual or constructive"). "Evidence of actual and constructive knowledge may be found in 'cease-and-desist letters, officer and employee statements, promotional materials, and industry experience." *Smith v. BarnesandNoble.com, LLC*, 12-CV-4374, 2015 WL 6681145, at *6 (S.D.N.Y. Nov. 2, 2015) (quoting *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 658 [S.D.N.Y. 2013]).

Furthermore, "[a]n allegation that a defendant 'merely provid[ed] the means to accomplish an infringing activity' is insufficient to establish a claim for contributory infringement." *Wolk*, 840 F. Supp. 2d at 750 (quoting *Livnat v. Lavi*, 96-CV-4967, 1998 WL 43221, at *3 [S.D.N.Y. Feb. 2, 1998]). "Rather, participation in the infringement must be 'substantial' and the 'authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer.'" *Brought to Life Music*, 2003 WL 296561, at *2 (quoting *Livnat*, 1998 WL 43221, at *3). Thus, "one who furnishes a copyrighted work to another but is innocent of any knowledge of the other party's intended illegitimate use will not be liable.'" *Wolk*, 840 F. Supp. 2d at 750 (quoting *Livnat*, 1998 WL 43221, at *3).

### 1.    Adirondack Defendants

Adirondack argues that, although it undisputedly furnished Plaintiff's Vly Point design to Defendants Kazmierczak and Northstar, Plaintiff has failed to offer admissible evidence demonstrating that ADG directed Defendants Kazmierczak and Northstar to copy Plaintiff's

design and hold it out as their own. (Dkt. No. 101, Attach. 9, at 23 [Adirondack's Mem. of Law].) Rather, Adirondack argues that it was forced to provide the design to Defendants Kazmierczak and Northstar to make it buildable in order to finish construction of the projects. (*Id.*) Adirondack further notes that the supplemental plans prepared by Defendants Kazmierczak and Northstar specifically refer the reader to Plaintiff's design for additional detail. (*Id.* at 23-24.)

The Court finds that the Adirondack Defendants, with the exception of Paul Hodorowki and J. Luk Construction, are liable for contributory copyright infringement as a matter of law with respect to Plaintiff's Vly Point design.[11] As discussed above in Point I.A. of this Decision and Order, the undisputed facts demonstrate that ADG terminated Plaintiff's employment before completion of this project. At this time, Plaintiff advised John Hodorowski and ADG that it could no longer use his design, and ADG responded that it would not do so. (Dkt. No. 94, Attach. 21, ¶ 36 [Pl.'s Rule 7.1 Statement].) Although ADG compensated Plaintiff for his design, it used the design in a way that was expressly prohibited by its contract terms. More specifically, as discussed above in Point III.B.1. of this Decision and Order, the contract terms expressly prohibited ADG from engaging a third-party architect to complete the projects using Plaintiff's design or without his involvement unless he was adjudged in breach of contract. Nonetheless, ADG retained Defendants Kazmierczak and Northstar, instructed them to make minor modifications to Plaintiff's design, and then labeled the design as belonging to ADG and

---

[11] It appears that the Adirondack Defendants would be liable for contributory copyright infringement with respect to Admiral's Walk as well. However, because the Court previously found that a triable issue of fact exists regarding whether Plaintiff's Admiral's Walk design is entitled to copyright protection, the Court need not, and does not, reach a determination with regard to this issue.

drawn by Northstar.  (*Id.*, ¶¶ 41-46; Dkt. No. 94, Attach. 2.)  Francis Hodorowski was aware of

these actions.  (Dkt. No. 94, Attach. 21, ¶ 53 [Pl.'s Rule 7.1 Statement].)  While the design refers

the reader to Plaintiff's design, the design itself give no credit to Plaintiff as an author or owner

of the original design.  Under these circumstances, the Court finds that the Adirondack

Defendants knew or should have known that their actions constituted direct infringement of

Plaintiff's design as a matter of law.

With regard to Jordan Point, the Court finds that the Adirondack Defendants, with the

exception of Paul Hodorowski and J. Luk Construction, had actual knowledge that they were

infringing upon Plaintiff's Patroon Point designs.  Specifically, ADG knowingly used the Patroon

Point designs for the Jordan Point project without Plaintiff's knowledge or permission.  (*Id.*, ¶¶

102-04, 108.)

Finally, this claim is dismissed as to Defendants Paul Hodorowski and J. Luk

Construction.  As discussed above in Point III.A.2.b. of this Decision and Order, no evidence has

been presented that these Defendants engaged in actual infringement of Plaintiff's designs.

"[B]ecause there can be no contributory infringement absent actual infringement," *Faulkner v.

Nat'l Geographic Enters., Inc.*, 409 F.3d 26, 40 (2d Cir. 2005), dismissal of Plaintiff's

contributory copyright infringement claim against these two Defendants is appropriate.

### 2.    Defendants Kazmierczak, Lamb, and Northstar

The Court finds that Defendants Kazmierczak and Northstar are not liable for

contributory copyright infringement.  Plaintiff argues that Defendant Kazmierczak should have

known of the infringement being committed because Defendant Kazmierczak testified that he

had never been asked to modify or redraft another's drawings before.  (Dkt. No. 94, Attach. 20, at

13-14 [Pl.'s Mem. of Law].) Indeed, Defendant Kazmierczak testified that, when given

Plaintiff's designs by ADG, he observed Plaintiff's name on those designs and inquired as to

whether ADG had permission to use them because Defendant Kazmierczak did not "normally . . .

work off of anybody else's drawings[.]" (Dkt. No. 93, Attach. 13, at 19:8-9 [Kazmierczak

Dep.].) In response, ADG assured Defendant Kazmierczak that they had permission to use the

designs because it had purchased the designs and had the right to use them going forward. (*Id.*,

at 18:11-19:3; 22:2-23:8; 40:5-18.) Plaintiff has failed to submit any evidence demonstrating

that Defendant Kazmierczak should have doubted the truthfulness of this response. Accordingly,

because Plaintiff has failed to demonstrate that Defendant Kazmierczak had the requisite

knowledge to establish a claim for contributory copyright infringement, Plaintiff's claim against

Defendant Kazmierczak, Northstar Home Designs, and Creative Concepts is dismissed.

Finally, as discussed above in Point III.A.2.b. of this Decision and Order, Plaintiff has

failed to demonstrate that Defendant Lamb engaged in actual infringement of Plaintiff's designs.

Therefore, Plaintiff's contributory copyright infringement claim against Defendant Lamb is also

dismissed.

### 3. C.B. Prime and Defendant Raymond

The Court finds a triable issue of fact exists as to whether C.B. Prime knew or should

have known of any infringement upon Plaintiff's Vly Point and Patroon Point/Jordan Point

designs. Specifically, Capital Development Group, LLC, which is half owned by Defendant

Raymond, was the owner and developer on both projects. Plaintiff commenced this action on

August 24, 2011, and, despite Defendant Raymond's knowledge of the lawsuit, C.B. Prime

continued to advertise and market the subject properties without question. (Dkt. No. 109,

Attachs. 4-7.)  *See Usenet.com*, 633 F. Supp. 2d at 154 (stating that "[t]urning a 'blind eye' to

infringement has also been found to be the equivalent of knowledge"); *In re: Aimster Copyright

Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) (noting that "[w]illful blindness is knowledge").

Therefore, there is admissible record evidence that C.B. Prime, through its owner, Defendant

Raymond, should have known that marketing and advertising the subject properties in the

manner in which it did was infringement.

Finally, as discussed above in Point III.A.2.c. of this Decision and Order, Plaintiff has

failed to demonstrate that Defendant Raymond, in his individual capacity, is liable for direct

infringement of Plaintiff's designs.  Therefore, dismissal of Plaintiff's contributory copyright

infringement claim against Defendant Raymond is warranted.

### 4.    Vicarious Liability

Plaintiff argues that Defendants are liable for vicarious copyright infringement.  (*See

generally* Dkt. No. 94, Attach. 20, at 9-14 [Pl.'s Mem. of Law]; Dkt. No. 109, Attach. 10, at 5-7

[Pl.'s Opp'n Mem. of Law to C.B. Prime].)  However, Plaintiff's Amended Complaint does not

assert a cause of action for vicarious liability; rather, Count Four merely asserts a cause of action

for contributory copyright infringement.  (Dkt. No. 52, ¶¶ 107-111 [Pl.'s Am. Compl.].)[12]  This is

important because cases treat these theories of liability as two distinct causes of action.  *See*, *e.g.*,

*Louis Vuitton Malletier, S.A. v. Akanoc Sol., Inc.*, 591 F. Supp. 2d 1098, 1103 n.6 (N.D. Cal.

2008) (stating that "contributory and vicarious copyright infringement [claims] are distinct

_____

[12]    While one paragraph contained in Count IV of Plaintiff's Amended Complaint
(labeled "Contributory Copyright Infringement") alleges certain of the elements of a vicarious
liability claim, it omits certain of those elements (i.e., the directness of the financial interest and
the right and ability to supervise the infringing activity).  (*Id.*, ¶ 110.)  Under the circumstances,
the Court cannot even liberally construe that paragraph as asserting a claim different from the
claim expressly identified in the heading above it.

theories of secondary liability"); *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)

(stating that "[w]e recognize three doctrines of copyright liability: direct copyright infringement,

contributory copyright infringement, and vicarious copyright infringement"); *cf. Sony Corp. of*

*Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 n.17 (1984) (noting that "the lines

between direct infringement, contributory infringement, and vicarious liability are not clearly

drawn"). More specifically, "[i]n order to establish [vicarious] liability, a plaintiff must

demonstrate that the defendant (1) had the right and ability to supervise the infringing activity

and (2) has a direct financial interest in such activities." *UMG Recording, Inc. v. Escape Media*

*Grp., Inc.*, 11-CV-8407, 2014 WL 5089743, at *23 (S.D.N.Y. Sept. 29, 2014). "Thus, vicarious

liability is premised wholly on direct financial benefit and the right and ability to control

infringement; it does not include an element of knowledge or intent on the part of the vicarious

infringer." *Usenet.com*, 633 F. Supp. 2d at 156.

The Court acknowledges that it may have conflated these two causes of action when

discussing contributory copyright infringement in deciding Defendants' underlying motion to

dismiss. *See Ranieri v. Adirondack Dev. Grp.*, 11-CV-1013, 2013 WL 1292010, at *3 (N.D.N.Y.

Mar. 27, 2013) (stating that, "where a defendant has knowledge of infringement, the ability to

police the infringing conduct, and derived substantial benefit from the infringement, it will be

liable for contributory infringement") (internal quotation marks omitted). However, this

conflation appears to have had no effect on how the claim was drafted in Plaintiff's Amended

Complaint, given that it remained unchanged from the original version in Plaintiff's Complaint.

(*Compare* Dkt. No. 1, ¶¶ 102-06 [Pl.'s Compl.] *with* Dkt. No. 52, ¶¶ 107-111 [Pl.'s Am.

Compl.].) Furthermore, although the Adirondack Defendants responded to Plaintiff's arguments

regarding vicarious liability, C.B. Prime and Defendant Raymond did not do so, limiting their responses to Plaintiff's contributory infringement claim. Indeed, C.B. Prime and Defendant Raymond refer to Plaintiff's vicarious liability claim as "belated," perhaps recognizing that a claim for vicarious infringement liability was never explicitly pleaded. (Dkt. No. 116, at 6 [C.B. Prime's Reply Mem. of Law].)[13] Under these circumstances, the Court finds it inappropriate to determine the merits of a claim, on a motion for summary judgment, that was not asserted in Plaintiff's Amended Complaint. Accordingly, any claim for vicarious copyright infringement is dismissed without prejudice. The Court notes that it would be willing to entertain, at trial, a motion to conform the pleadings to the evidence under Fed. R. Civ. P. 15(b)(1), should the evidence be presented in support of this claim.

### E. Whether the First Sale and Exhaustion Doctrines Preclude Plaintiff's Infringement Claims Related to Vly Point and Admiral's Walk

Section 109 of the Copyright Act holds that, where the owner of a copyrighted work transfers ownership of a copy of that work, "the person to whom the copy . . . is transferred is entitled to dispose of it by sale . . . or any other means." *Microsoft Corp. v. Harmony Computs. & Electrs., Inc.*, 846 F. Supp. 208, 212 (E.D.N.Y. 1994) (quoting Historical Note to 17 U.S.C. § 109). Furthermore, "the defendant has the burden of proving that the particular pieces of the copyright work that he sold were lawfully made or acquired." *Microsoft Corp.*, 846 F. Supp. at 212; *accord*, *Mapinfo Corp. v. Spatial Re-Eng'ring Consultants*, 02-CV-1008, 2006 WL 2811816, at *20 (N.D.N.Y. Sept. 28, 2006) (Homer, M.J.).

---

[13] The Court can only speculate as to whether any discovery was conducted on this unpled claim.

Adirondack and C.B. Prime argue that Plaintiff provided ADG with a limited license to use his plans on the Vly Point and Admiral's Walk projects. (Dkt. No. 110, at 17-18 [Adirondack's Opp'n Mem. of Law]; Dkt. No. 98, Attach. 2, at 17-19 [C.B. Prime's Mem. of Law].) Therefore, Adirondack and C.B. Prime argue that Plaintiff's copyrights were exhausted under the first sale doctrine and ADG was free to construct condominiums from Plaintiff's designs. (*Id.*)

As discussed above in Points III.B.1 and III.B.2. of this Decision and Order, Plaintiff expressly retained ownership of the copyrights for his designs in the Vly Point and Admiral's Walk contracts and did not grant a license for his designs to be used in the way in which they were. Therefore, Defendants have failed to establish that the final designs they used to construct the subject buildings were lawfully acquired. Finally, with respect to Jordan Point, Plaintiff never sold or gave a license for his Patroon Point designs to be used on the Jordan Point project. Accordingly, the First Sale doctrine does not preclude Plaintiff's infringement claims.

### F.     Whether C.B. Prime's Use of Plaintiff's Designs Was Permissible Under the Fair Use Doctrine

After carefully considering the matter, the Court finds material questions of fact exist concerning whether C.B. Prime's use of Plaintiff's designs was fair use for the reasons set forth below.

Although the Copyright Act grants copyright holders a bundle of exclusive rights, "copyright law recognizes the need for breathing space." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014). Therefore, "a defendant who otherwise would have violated one or more of these exclusive rights may avoid liability if he can establish that he

-57-

made 'fair use' of the copyrighted material." *Swatch*, 756 F.3d at 81. "To evaluate whether a particular use qualifies as 'fair use,' [the court] must engage in an 'open-ended and context-sensitive inquiry.'" *Id.* (quoting *Blanch v. Koons*, 467 F.3d 244, 251 [2d Cir. 2006]). The Copyright Act directs that, in determining whether a particular use is fair, "the factors to be considered shall include" the following:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

"[T]hese four factors are non-exclusive." *Swatch*, 756 F.3d at 81. Furthermore, "[a]lthough Defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in Section 107 weighs in their favor." *N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 614 (S.D.N.Y. 2015) (citing *Swatch*, 756 F.3d at 81). "Instead, the factors 'are to be explored, and the results weighed together, in light of the purposes of copyright.'" *Pirro*, 74 F. Supp. 3d at 614 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 [1994]). "Although fair use is a mixed question of law and fact, courts in the Second Circuit have 'on a number of occasions' resolved fair use determinations at the summary judgment stage where there are no genuine issues of material fact." *Id.* (citing *Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 137 [2d Cir. 1998]).

### 1. Factor One: the Purpose and Character of the Use

"The first factor, which addresses the manner in which the copied work is used, is 'the heart of the fair use inquiry.'" *Id.* (quoting *Blanch*, 467 F.3d at 251). "An important focus of the first factor is whether the use is 'transformative.'" *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014). "A use is transformative if it does something more than repackage or republish the original copyrighted work. The inquiry is whether the work 'adds something new, with a further purpose or different character, altering the first with new expression, meaning or message.'" *HathiTrust*, 755 F.3d at 96 (quoting *Campbell*, 510 U.S. at 579). "[T]he more transformative the new work, the less will be the significance of other factors . . . that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. However, "[a]dded value or utility is not the test: a transformative work is one that serves a new and different function from the original work and is not a substitute for it." *HathiTrust*, 755 F.3d at 96.

### a. Transformative Use

C.B. Prime argues that it used only very basic drawings of Plaintiff's designs to show the configuration (i.e., floor plan) of "standard" condominium units. (Dkt. No. 98, Attach. 2, at 14-15 [C.B. Prime's Mem. of Law].) C.B. Prime further argues that the purpose of using these drawings in its advertisements was for illustrative purposes only and not to construct a building or to sell the drawings/designs to others who might use them to build a condominium. (*Id.* at 20.) Finally, C.B. Prime argues that the purpose of using the drawings was to educate the "purchasing public" about the attributes of properties that were for sale. (*Id.*)

The Court is unpersuaded that C.B. Prime sufficiently transformed Plaintiff's designs by simplifying them for its marketing materials. C.B. Prime did little more than eliminate the

technical information from the floor plans so that they could advertise the basic floor plans of the condominium units. (Dkt. No. 109, Attach. 7 [C.B. Prime's Marketing Materials].) In other words, it did nothing to expand upon or change the fundamental features of the floor plans. As far as the Court can discern, C.B. Prime merely copied Plaintiff's drawings and repackaged them in a way that made them easier for review by potential customers. (*Id.*) Accordingly, the Court finds that C.B. Prime's use of Plaintiff's drawings is barely transformative, if at all.

### b. Commercial Use

"As part of the first factor, the Court must also consider whether, and to what extent, Defendants' use was for a commercial purpose. This consideration arises when a secondary user makes unauthorized use of copyrighted material to gain a profit through copying the original work." *Pirro*, 74 F. Supp. 3d at 617-18. "While financial gain 'will not preclude [the] use from being a fair use,' consideration of the commercial use is an important one." *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1532 (S.D.N.Y. 1991) (quoting *New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F. Supp. 217, 221 [D.N.J. 1977]); *see also Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013) (instructing that the first factor "must be applied with caution because, as the Supreme Court has recognized, Congress 'could not have intended' a rule that commercial uses are presumptively unfair"). "Rather, the relative importance of this factor is determined on a sliding scale: the more transformative the work, the less important the commercial purpose." *Pirro*, 74 F. Supp. 3d at 618. Because C.B. Prime's use was hardly transformative, "the question whether the new use is commercial thus acquires an importance it [would] not [otherwise] have." *Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001); *U.S. v. Am. Soc'y of Composers, Authors & Publishers*, 599 F. Supp. 2d 415, 429 (S.D.N.Y. 2009)

(holding that "applicant's use of previews is not transformative, and, thus, the significance of its commercial use is not reduced, but instead takes on greater importance").

As noted in the preceding section, C.B. Prime argues that the purpose of using Plaintiff's drawings was, in part, to educate the public about the attributes of properties that were for sale. However, it cannot be denied that the primary motive for marketing the floor plans was to attract potential customers and sell the properties for financial gain. *See Koons*, 960 F.2d at 309 (finding that use of a copyrighted work for personal gain militates against a finding of fair use); *CSM Inv'rs, Inc. v. Everest Dev., Ltd.*, 840 F. Supp. 1304, 1312 (D.Minn. 1994) (holding that "[t]he fact that plaintiffs used Everest's [architectural] plans for profit weighs heavily against a finding of fair use"). Accordingly, the Court finds that both transformative and commercial considerations weigh against fair use.

### 2. Factor Two: the Nature of the Work

The second statutory consideration calls for the recognition that "some works are closer to the core of intended protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. In particular, "creative expression for public dissemination falls within the core of the copyright's protective purposes." *Id.* "Architectural works are generally considered creative works." *Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC*, 629 F. Supp. 2d 526, 534 (E.D. Va. 2008). C.B. Prime does not argue that this factor weighs in its favor. Accordingly, because Plaintiff's designs are creative works, the Court finds that this factor also weighs against a finding of fair use.

### 3. Factor Three: the Amount and Substantiality of the Portion Used

The third statutory consideration concerns "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). "The question is whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Pirro*, 74 F. Supp. 3d at 620 (citing *Campbell*, 510 U.S. at 586). "In general, 'the more of a copyrighted work that is taken, the less likely the use is to be fair.'" *Swatch*, 756 F.3d at 89 (quoting *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 [2d Cir. 1998]). In other words, "[t]he crux of the inquiry is whether 'no more was taken than necessary.'" *HathiTrust*, 755 F.3d at 98 (quoting *Campbell*, 510 U.S. at 589).

Here, C.B. Prime used a rudimentary version of Plaintiff's designs to advertise the floor plans. Therefore, because C.B. Prime used only the basic features of Plaintiff's designs, the Court finds that this factor weighs in favor of fair use.

### 4. Factor Four: the Effect of the Use Upon the Market for or Value of the Original

The Supreme Court has described this factor as "undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985). This is because it touches on the copyright owner's ability to "capture the fruits of his labor and hence his incentive to create." *Bond v. Blum*, 317 F.3d 385, 396 (4th Cir. 2003). This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (quoting 3 M. Nimmer & D. Nimmer, *Nimmer on*

Copyright § 13.05[A][4] [1993]); *see also NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 481 (2d Cir. 2004) (stating that "[t]he focus . . . is on whether defendants are offering a market substitute for the original").

The Second Circuit has "made clear that '[the court's] concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use *usurps* the market of the original work.'" *Cariou*, 714 F.3d at 708 (quoting *Blanch*, 467 F.3d at 258). "[A]n alleged infringer has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original." *Pirro*, 74 F. Supp. 3d at 621-22 (citing *Cariou*, 714 F.3d at 709).

The Court finds that C.B. Prime's use of Plaintiff's designs undermines, and certainly competes with, the market for these designs. However, the Court does not believe that C.B. Prime's use *usurps* the market for Plaintiff's designs. More specifically, no admissible evidence has been submitted demonstrating that the designs are exclusive to the buildings constructed by ADG in the Albany, New York, area. Therefore, Plaintiff could license or sell his designs to another developer who, in turn, could construct and market the finished buildings in the same or different location. Stated differently, Plaintiff's designs are still viable and can be marketed for other projects. Accordingly, the Court finds that this factor weighs in favor of fair use.

### 5. Overall Assessment

Weighing these factors together, the Court cannot conclude, as a matter of law, that C.B. Prime's use of Plaintiff's designs was fair. Specifically, while the first and second factors weigh against fair use, the second factor is rarely determinative and is not so in this case. On the other

hand, the third and fourth factors weigh in favor of fair use. Moreover, as stated above, the

fourth factor is perhaps the most important consideration. Accordingly, the Court finds that

reasonable minds could differ as to whether fair use applies when weighing all of these factors

together. Therefore, C.B. Prime's motion for summary judgment on this basis must be denied,

and Plaintiff's motion for summary judgment with respect to C.B. Prime's liability must also be

denied.

### G. Whether Defendants Violated the Lanham Act

After carefully considering the matter, the Court answers this question in the negative for

the reasons set forth below.

The Lanham Act makes actionable false or misleading representations that are likely to

cause confusion or deception as to the origin of goods or services. 15 U.S.C. § 1125(a)(1)(A).

However, the Lanham Act "'does not protect the content of a creative work of artistic expression'

because an 'artist's right in an abstract design or other creative work' is protected by copyright

law." *Ward v. Andrews McMeel Pub., LLC*, 963 F. Supp. 2d 222, 235 (S.D.N.Y. 2013) (quoting

*EMI Catalogue P'Ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F3d 56, 63 [2d Cir.

2000]).

In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), a case similar

to the present matter, Dastar copied defendant's creative work (a film), made minor revisions,

and then marketed the revised product as its own. *Dastar*, 539 U.S. at 26-27. The Supreme

Court discussed what is meant by "false designation of origin" under § 1125(a)(1)(A). The Court

held that this section covers only "the producer of the tangible goods that are offered for sale, and

not . . . the author of any idea, concept, or communication embodied in those goods." *Id.* at 37.

Although the Supreme Court recognized that consumers of communicative products, such as books and films might be concerned about the identity of the author of those works, it held that claims about the misdesignation of the authorship of such works did not fall within the purview of the Lanham Act because this sort of claim falls within the purview of copyright law. *Id.* at 33-35. Courts have held that *Dastar* applies with equal force to architectural works. *See*, *e.g.*, *Moser Pilon Nelson Architects, LLC v. HTNB Corp.*, 05-CV-0422, 2006 WL 2331013 (D. Conn. Aug. 8, 2006); *Francois v. Jack Ruch Quality Homes, Inc.*, 03-CV-1419, 2006 WL 2361892 (C.D. Ill. Aug. 14, 2006).

Here, Plaintiff has alleged that Defendants actions have created "false designations of origin and false and misleading representations of fact that are likely to cause confusion . . . or to deceive as to the affiliation, connection or association of Defendants with Ranieri, or as to the origin, sponsorship or approval of Defendants' goods, services, or other commercial activities by Ranieri." (Dkt. No. 52, ¶ 115 [Pl.'s Am. Compl.].) Accordingly, Plaintiff's Lanham Act claim fails under *Dastar*. *See Radolf v. Univ. of Ct.*, 364 F. Supp. 2d 204, 222 (D. Conn. 2005) (holding that "[b]ecause [Plaintiff]'s claim centers around his contention that he was the 'author' or originator of the ideas and concepts that underlie the [disputed work], his Lanham Act claim necessarily fails in light of *Dastar*"); *Carroll v. Kahn*, 03-CV-0656, 2003 WL 22327299, at *5 (N.D.N.Y. Oct. 9, 2003) (McAvoy, J.) ("A Lanham Act claim based on Defendants' alleged failure to give Plaintiff proper credit as author and/or producer . . . is foreclosed by *Dastar*.").

### H. Whether Plaintiff May Recover Statutory Damages and/or Attorneys' Fees

After carefully considering the matter, the Court answers this question in the negative for the reasons set forth below.

Adirondack and C.B. Prime argue that Plaintiff is not entitled to statutory damages or attorneys' fees because he did not register his copyrights until well after the alleged infringement began. (Dkt. No. 101, Attach. 9, at 20-21 [Adirondack's Mem. of Law]; Dkt. No. 98, Attach. 2, at 21-22 [C.B. Prime's Mem. of Law].)

Section 504 of the Copyright Act sets forth the types of remedies a plaintiff may seek in a lawsuit for copyright infringement. 17 U.S.C. § 504. That section provides a plaintiff with the option of electing one of two types of remedies: "(1) the copyright owner's actual damages and any additional profits of the infringer . . . or (2) statutory damages." 17 U.S.C. § 504(a)(1), (2). Additionally, § 505 provides that the court, in its discretion, may award attorneys' fees and costs to the prevailing party. 17 U.S.C. § 505. "However, the Copyright Act limits the availability of statutory damages and attorneys' fees to only those plaintiffs who registered their copyright prior to the commencement of the infringement." *Levine v. Landy*, 832 F. Supp. 2d 176, 184 (N.D.N.Y. 2011) (Hurd, J.); *see also Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 158 (2d Cir. 2007). Specifically, § 412 of the Copyright Act provides that

> [N]o award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412(2).

It is undisputed that Plaintiff registered his designs for Vly Point on May 12, 2011, and May 24, 2012, for Admiral's Walk on June 7, 2011, and for Patroon Point between May 2011 and June 2012. It is also undisputed that the alleged infringing acts first began in 2007.

Therefore, Plaintiff did not register his copyrights until well after the alleged infringement began.

Plaintiff argues that, in light of the Supreme Court's decision in *Petrella*, any acts of infringement occurring after the dates he registered his copyrights should still be subject to statutory damages and attorney's fees. (Dkt. No. 109, Attach. 9, at 21-22 [Pl.'s Mem. of Law].) As discussed above in Points C.1. and C.2. of this Decision and Order, Plaintiff did not discover the infringing acts until 2009 (i.e., the acts regarding the Admiral's Walk and Vly Point designs) and 2010 (i.e., the acts regarding the Jordan Point design). Therefore, even accepting Plaintiff's argument that the discovery rule should be applied in this context, the Court finds that Plaintiff discovered the infringing acts more than three months prior to registering his copyrights. The Second Circuit has held that "a plaintiff may not recover statutory damages and attorney's fees for infringement occurring *after* registration if that infringement is part of an ongoing series of infringing acts and the first act occurred before registration." *Troll Co.*, 483 F.3d at 158 (emphasis added); *accord*, *C.A. Inc. v. Rocket Software, Inc.*, 579 F. Supp. 2d 355, 364 (E.D.N.Y. 2008). Accordingly, the Court finds that Plaintiff is precluded from recovering statutory damages and attorneys' fees related to his infringement claims.

### I. Whether Plaintiff's Claim for Unfair Competition Under N.Y. Gen. Bus. Law § 349 Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth below.

"Section 349 of the New York General Business Law is a consumer protection statute." *Levine*, 832 F. Supp. 2d at 192. It provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . .

unlawful." N.Y. Gen. Bus. Law § 349(a). "It creates a private right of action for consumers harmed by violation of the statute." *Levine*, 832 F. Supp. 2d at 192 (citing N.Y. Gen. Bus. Law § 349[h]). Therefore, "a plaintiff proceeding under section 349 'must demonstrate that the acts or practices [complained of] have a broader impact on consumers at large.'" *Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 204 (E.D.N.Y. 2010) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 [N.Y. 1995]). "Consumers in this context are defined as 'those who purchase goods and services for personal, family or household use.'" *Shema*, 832 F. Supp. 2d at 204 (quoting *Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 73 [N.Y. App. Div. 1st Dept. 2000]).

"Consequently, although the 'statute's consumer orientation does not preclude its application to disputes between businesses per se . . . it does severely limit it.'" *Id.* (quoting *Cruz v. NYNEX Info. Res.*, 263 A.D.2d 285, 290 [N.Y. App. Div. 1st Dept. 2000]); *see also C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 247 (S.D.N.Y. 2013) (noting that "[c]orporate competitors have standing to bring a Section 349 claim if 'the gravamen of the complaint [is] consumer injury or harm to the public interest.'") (quoting *Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F. Supp. 1084, 1089 n.6 [S.D.N.Y. 1988]). Accordingly, "where the 'dispute [is] between competitors [and] the core of the claim is harm to another business as opposed to consumers,' courts have found that the 'public harm . . . is too insubstantial[.]'" *C=Holdings*, 992 F. Supp. 2d at 247 (quoting *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 [S.D.N.Y. 2003]); *see also Oswego*, 85 N.Y.2d at 24 (holding that "[p]rivate contract disputes, unique to the parties, . . . would not fall within the ambit of the statute").

In the present case, Plaintiff has failed to allege facts plausibly suggesting, much less

adduce admissible record evidence establishing, that his alleged harm is a consumer injury or

directly affects consumers.  Rather, the facts establish that Plaintiff's complaints are with regard

to a private contract dispute that is unique to the parties.  Therefore, Plaintiff's GBL § 349 claim

is dismissed.

## J.    Whether Plaintiff's Claim for Interference with Business Relations/Contract and Interference with Economic Advantage Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative

for the reasons set forth below.

"In the Second Circuit, it is well settled that claims for tortious interference based on the

unauthorized publication of a work protected by the Copyright Act are preempted." *Am. Movie

Classics Co. v. Turner Entm't Co.*, 922 F. Supp. 926, 932 (S.D.N.Y. 1996).  The Copyright Act

preempts a state law claim when the following circumstances are present: "'(1) the particular

work to which the claim is being applied falls within the type of works protected by the

Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or

equitable rights that are equivalent to one of the bundle of exclusive rights already protected by

copyright law under 17 U.S.C. § 106.'" *Miller v. Holtzbrinck Publishers, L.L.C.*, 377 F. App'x

72, 73-74 (2d Cir. 2010) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296,

305 [2d Cir.2004]).  In applying this standard, the Second Circuit takes "a restrictive view of

what extra elements transform an otherwise equivalent [state law] claim into one that is

qualitatively different from a copyright infringement claim." *Briarpatch*, 373 F.3d at 305. "More

specifically, '[i]f unauthorized publication is the gravamen of [plaintiff's] claim, then it is clear

that the right [she] seek[s] to protect is coextensive with an exclusive right already safeguarded by the [Copyright] Act' and thus that state law claim is preempted." *Miller*, (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 [2d Cir.1983]).

"To establish a claim based on tortious interference with business relations or with prospective economic advantage, a plaintiff must demonstrate: (1) the existence of a business relationship with a third party; (2) defendant's interference with the relationship; (3) that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair or improper means; and (4) that the plaintiff sustained damages." *Quadrille Wallpapers & Fabric, Inc. v. Pucci*, 10-CV-1394, 2011 WL 3794238, at *6 (N.D.N.Y. Aug. 24, 2011) (Kahn, J.).

"Under New York law, the elements of tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract, and (5) damages resulting therefrom." *Highland Capital Mgmt. LP v. Schneider*, 198 F. App'x 41, 46 (2d Cir. 2006).

In the present case, it appears that Plaintiff's claims are different from those for copyright infringement. However, "[t]o determine whether a claim is qualitatively different [for purposes of preemption], we look to 'what [plaintiff] seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced.'" *Briarpatch*, 373 F.3d at 306 (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 [2d Cir. 1992]). Moreover, "'[e]lements such as awareness or intent, which alter the action's scope but not its nature,' do not constitute extra elements that would permit a state law claim to proceed without being preempted by the Copyright Act." *Quadrille*, 2011 WL 3794238, at *4 (quoting *Computer Assocs.*, 982 F.2d at 717.

Here, the first prong of the preemption test (also known as the subject matter requirement) is met because Plaintiff's designs are architectural works protected by the Copyright Act. With regard to the second prong, Plaintiff's tortious interference claims seek to redress a legal or equitable right that is equivalent to exclusive rights protected by the Copyright Act, namely his exclusive rights to sell, copy and distribute his designs under his own name. These claims depend on Plaintiff's allegations that his designs were used and modified without his permission, he did not receive full compensation for their use, and his name and seal were removed from the final designs. Under these circumstances, the Court finds that the preemption requirements are met and Plaintiff's tortious interference claims must therefore be dismissed. *See Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 713 F. Supp. 2d 215, 228 (S.D.N.Y. 2010) (dismissing plaintiff's tortious interference with business relations claim because it was "solely grounded on unauthorized copying"); *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1322-23 (S.D.N.Y. 1997) (holding that "claims for tortious interference that are based on allegations of unauthorized exploitation of copyrighted material are preempted by federal copyright law").

### K. Whether Plaintiff's Conspiracy Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth below.

It is well established that, "[u]nder New York law, a claim for civil conspiracy may stand only if it is connected to a separate underlying tort." *Treppel v. Biovail Corp.*, 03-CV-3002, 2005 WL 2086339, at *5 (S.D.N.Y. Aug. 30, 2005); *see also Decter v. Second Nature Therapeutic Program, LLC*, 42 F. Supp. 3d 450, 465 (E.D.N.Y. 2014) (stating that "[i]t is axiomatic that civil

conspiracy cannot be alleged as a separate claim because New York does not recognize civil conspiracy as an independent tort").  Because the Court has found that Defendants are entitled to summary judgment on Plaintiff's tort claims, Plaintiff's conspiracy claim must also be dismissed.

**L.    Whether Plaintiff's Breach-of-Contract Claims Should Be Dismissed as to All Defendants Except Adirondack and Hodorowski Homes, LLC**

After carefully considering the matter, the Court answers this question in the negative for the reasons set forth below.

Adirondack argues that Plaintiff's breach-of-contract claims should be dismissed against Defendants Hodorowski Homes, LLC, Capital Development Group, LLC, J. Luk Construction Co., LLC, and the individual Hodorowski Defendants because it is undisputed that no privity existed between Plaintiff and any of these Defendants on the Vly Point or Admiral's Walk projects.  (Dkt. No. 101, Attach. 9, at 34-35 [Adirondack's Mem. of Law].)

In opposition, Plaintiff states that he has chosen to discontinue his breach-of-contract claims against Defendants Capital Development Group, LLC, J. Luk Construction Co., LLC, and the individual Hodorowski Defendants.  (Dkt. No. 109, Attach. 9, at 26-27 [Pl.'s Opp'n Mem. of Law].)  However, Plaintiff opposes dismissal of his breach-of-contract claim against Hodorowki Homes, LLC, because ADG simply changed its name to Hodorowski Homes, LLC, and is selling the infringing buildings under that new name.  (*Id.* at 27.)

In reply, Adirondack fails to submit any arguments in response to Plaintiff's opposition on this point.  (Dkt. No. 117, at 23 [Adirondack's Reply Mem. of Law].)

"As a general rule, a corporation which acquires the assets of another corporation is not liable for the torts of its predecessor."  *Nationwide Mut. Fire Ins. Co. v. Long Island A.C., Inc.*,

78 A.D.3d 801, 801 (N.Y. App. Div. 2d Dept. 2010) (citing *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244 [N.Y. 1983]). "However, a corporation may be held liable for the torts of its predecessor if (1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction was entered into fraudulently to escape such obligations." *Nationwide*, 78 A.D.3d at 801-02. "This doctrine is also applicable in breach of contract actions. For a successor corporation to establish that it is entitled to summary judgment on the ground that it is not liable, it must demonstrate that none of the four aforementioned exceptions applies." *Id.* at 802 (internal citations omitted).

The Court finds that the third factor applies to Hodorowski Homes, LLC, and, because Adirondack has failed to respond to Plaintiff's argument on this point, Adirondack has failed to demonstrate that Hodorowski Homes, LLC, should not be held liable for breach-of-contract. Accordingly, Adirondack's motion for summary judgment seeking to dismiss Plaintiff's breach-of-contract claim against Hodorowski Homes, LLC, is denied.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for partial summary judgment (Dkt. No. 93) with respect to liability on his copyright infringement claims (Counts One through Four) is **GRANTED** in part and **DENIED** in part as follows:

a. Plaintiff's motion for copyright infringement (Count One) and contributory copyright infringement liability (Count Four) with respect to his Admiral's Walk design is **DENIED**;

-73-

b.     Plaintiff's motion for copyright infringement with respect to the Vly Point and Jordan Point designs (Counts Two and Three) is **<u>GRANTED</u>** against all of the individual Adirondack and Northstar Defendants except Paul Hodorowski, J. Luk Construction Co., and Stephen Lamb;

c.     Plaintiff's motion for contributory copyright infringement with respect to the Vly Point and Jordan Point designs (Count Four) is **<u>GRANTED</u>** against all of the individual Adirondack Defendants except Defendants Paul Hodorowski and J. Luk Construction Co. and the Northstar Defendants;

d.     Plaintiff's claim for vicarious copyright infringement is **<u>DISMISSED</u>** without prejudice, because the Court finds it inappropriate to determine the merits of a claim, on a motion for summary judgment, that was not asserted in Plaintiff's Amended Complaint; and it is further

**ORDERED** that the Northstar Defendants' motion for summary judgment (Dkt. No. 97) is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part as follows:

a.     Northstar's motion for summary judgment seeking to dismiss Plaintiff's copyright infringement claims (Counts One through Three) against Defendants John Kazmierczak, Northstar Home Designs, LLC, and Creative Concepts Home Plan Services, LLC, is **<u>DENIED</u>**;

b.     Northstar's motion for summary judgment seeking to dismiss Plaintiff's copyright infringement claims (Counts One through Three) against Defendant Stephen Lamb is **<u>GRANTED</u>**;

c.     Northstar's motion for summary judgment seeking to dismiss Plaintiff's contributory copyright infringement claim (Count Four) against all of the individual Northstar Defendants is **<u>GRANTED</u>**;

d.     Northstar's motion for summary judgment seeking to dismiss Plaintiff's claims for tortious interference with contract, business relations, and prospective economic advantage (Counts Eleven and Twelve) against all of the individual Northstar Defendants is **<u>GRANTED</u>**; and it is further

**ORDERED** that the motion for summary judgment filed by C.B. Prime and Defendant Kenneth Raymond (Dkt. No. 98) is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part as follows:

a.     C.B. Prime's motion for summary judgment seeking to dismiss Plaintiff's copyright infringement claims, including his contributory copyright infringement claim (Counts One through Four), is **<u>DENIED</u>**;

b.     C.B. Prime's motion for summary judgment seeking to preclude Plaintiff from recovering statutory damages and attorneys' fees related to his infringement claims is **<u>GRANTED</u>**;

c.     Defendant Raymond's motion for summary judgment seeking to dismiss Plaintiff's claims for copyright infringement, including his contributory copyright infringement claim (Counts One through Four), is **<u>GRANTED</u>**;

d.     Defendant Raymond's motion for summary judgment seeking to dismiss Plaintiff's claims for tortious interference with contract, business relations, and prospective economic advantage (Counts Eleven and Twelve) is **<u>GRANTED</u>**; and it is further

**ORDERED** that the Adirondack Defendants' motion for summary judgment (Dkt. No. 101) is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part as follows:

a.   Adirondack's motion for summary judgment seeking to dismiss Plaintiff's claims for copyright infringement, including his contributory copyright infringement claim (Counts One through Four), is **<u>DENIED</u>**, except with respect to those claims against Paul Hodorowski and J. Luk Construction;

b.   Adirondack's motion for summary judgment seeking to dismiss Plaintiff's claims for copyright infringement, including his contributory copyright infringement claim (Counts One through Four), against Paul Hodorowski and J. Luk Construction is **<u>GRANTED</u>**;

c.   Adirondack's motion for summary judgment seeking to dismiss Plaintiff's claims under the Lanham Act (Count Five), the New York Unfair Trade Practices Act, N.Y. Gen. Bus. Law § 349 (Count Eight), civil conspiracy (Count Ten), and for tortious interference with contract, business relations, and prospective economic advantage (Counts Eleven and Twelve) is **<u>GRANTED</u>**;

d.   Adirondack's motion for summary judgment seeking to dismiss Plaintiff's breach-of-contract claims (Counts Six and Seven) against Defendants Capital Development Group, J. Luk Construction Co., and the individual Hodorowski Defendants, is **<u>GRANTED</u>**;

e.   Adirondack's motion for summary judgment seeking to dismiss Plaintiff's breach-of-contract claims (Counts Six and Seven) against Hodorowski Homes, LLC, is **<u>DENIED</u>**;

f.      Adirondack's motion to bar Plaintiff from recovering damages for copyright infringement with respect to the Jordan Point project that occurred prior to August 24, 2008, is **<u>DENIED</u>**;

g.      Adirondack's motion seeking to preclude Plaintiff from recovering statutory damages and attorneys' fees related to his infringement claims is **<u>GRANTED</u>**; and it is further

**ORDERED** that **SURVIVING** these motions for summary judgment are the following claims:

a.      Plaintiff's copyright infringement claims, including his contributory copyright infringement claim, against Defendant C.B. Prime (Counts One through Four);

b.      Plaintiff's claims for copyright infringement with respect to the Admiral's Walk design (Count One) against all Defendants except Defendants Raymond, Lamb, Paul Hodorowski, and J. Luk Construction;

c.      Plaintiff's claim for contributory copyright infringement with respect to the Admiral's Walk design (Count Four) against all Defendants except the Northstar Defendants and Defendants Raymond, Lamb, Paul Hodorowski, and J. Luk Construction;

d.      Plaintiff's breach-of-contract claim (Counts Six and Seven) against Adirondack Development Group, LLC, and Hodorowski Homes, LLC;

e.      Plaintiff's claim for unjust enrichment (Count Nine) against all remaining defendants;

f.      Plaintiff's claim for account stated (Count Thirteen) against all remaining defendants; and

g.      Plaintiff's claim for quantum meruit (Count Fourteen) against all remaining defendants; and it is further

**ORDERED** that counsel are directed to appear on **MARCH 24, 2016 at 11:30 am** in chambers for a pretrial conference, at which time counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to Defendants no later than **MARCH 14, 2016**, and the parties are directed to engage in meaningful settlement negotiations prior to the conference.

Dated: February 22, 2016
       Syracuse, New York

Hon. Glenn T. Suddaby
Chief, U.S. District Judge